(42 Misc. Rep. 321.)

### PEOPLE v. A. BOOTH & CO.

(Supreme Court, Trial Term, Schenectady County. November, 1903.)

1. FISH—STATUTES—SELLING AND TRANSPORTING—TAKEN WITHOUT STATE.
   Laws 1900, p. 30, c. 20, § 40, provides that trout shall not be sold during the closed season; and section 60, p. 34, provides that trout shall not be transported in the state, except when accompanied by the actual owner. *Held*, that the provisions applied only to fish taken in the state, and not to fish taken elsewhere.

2. SAME—POSSESSION OF IN CLOSED SEASON—CONSTITUTIONAL LAW.
   Laws 1902, p. 487, c. 194, § 141, prohibiting the possession during the closed season of trout taken outside the state, is void as an interference with interstate commerce, and not a proper exercise of the police power.

3. SAME—PROPERTY RIGHTS.
   Laws 1902, p. 487, c. 194, § 141, prohibiting the possession in the closed season of trout taken outside the state, is void as depriving citizens of the rights of property and liberty guarantied by the state Constitution, and is not a proper exercise of the police power.

4. SAME—FOREIGN LAWS—UNLAWFUL TAKING.
   The fact that trout acquired in Canada and brought into the United States were shipped out of the Dominion of Canada in violation to the game laws thereof did not render them any the less property; and hence they were not subject to section 141, Laws 1902, p. 487, c. 194.

Action by the people against A. Booth & Co. to recover penalties under the forest, fish, and game law. Complaint dismissed.

John D. Miller (Elon R. Brown, of counsel), for plaintiff.
Crangle & Burke, for defendant.

JOHN M. KELLOGG, J. The defendant, a foreign corporation extensively engaged in the fish business, with places of business in Canada and in several of our states, imported into the United States at Cape Vincent, from Kingston, Canada, brook trout in July and August, 1902, and stored the same in its cold storage at Cape Vincent, and in February last shipped some of the trout to a dealer in Schenectady. The trout were imported with other fish in a regular boat licensed by the United States to carry freight and passengers between Canadian and American ports, were duly reported, and passed through the United States customhouse, and the duties paid thereon. This action is brought to recover penalties under the forest, fish, and game law (Laws 1900, pp. 30, 34, 36, c. 20, §§ 40, 60, 69), for (1) having possession of, (2) selling, and (3) transporting such fish out of season. These provisions of the statute as to selling and transporting apply only to fish caught in the state, and do not relate to fish caught elsewhere. People v. Buffalo Fish Co., 164 N. Y. 93, 58 N. E. 34.

Since the above decision, section 141 was added to the statute by chapter 194, p. 487, of the Laws of 1902, which provides that, where the possession of fish or game is prohibited, reference is had equally to that coming from without as to that taken within the state, but, if game is caught in the open season, the owner may retain it by giving a bond conditioned that it will not be used during the closed season, and that he will not violate the forest, fish, or game law. This amendment, it will be observed, only relates to the prohibition of possession, and not to that of selling or transporting. Therefore there can be no recovery here for the selling or transporting.

It was held at Trial Term and Appellate Division in the case cited that a state law prohibiting the possession of imported trout was a violation of the foreign commerce clause of the United States Constitution. People v. Buffalo Fish Co., 30 Misc. Rep. 130, 62 N. Y. Supp. 543. The Appellate Division adopted the opinion of Mr. Justice Lambert upon the trial as a correct statement of the law. 45 App. Div. 631, 62 N. Y. Supp. 1143. In the Court of Appeals the decision was affirmed; Judges O'Brien, Parker, and Landon agreeing with the courts below; Judges Gray, Haight, and Martin dissenting; and Judge Warner concurring in the majority opinion upon the ground that the state law, as it then read, did not apply to foreign-caught fish. The decision of that case at the Trial Term and the Appellate Division, therefore, stands as the law upon this subject. See, also, to the same effect, In re Davenport (C. C.) 102 Fed. 540.

Where it was alleged that section 41 of the public health law (Laws 1893, p. 1510, c. 661), prohibiting the coloring or polishing of coffee to cover defects, was in conflict with the commerce clause of the Constitution, the court sustained the law as within the police power (Crossman v. Lurman, 171 N. Y. 329, 63 N. E. 1097), saying:

"The states have no power to regulate commerce with foreign countries or with each other. This power has been delegated to the Congress of the United States, and that body can, by law, determine what shall or shall not be permitted to be imported. With the right of importation follows the right of sale in original packages, and therefore the states cannot prohibit the sale of articles of commerce within their borders. The states cannot, under the guise

of inspection, or under their reserved police powers, prohibit the importation into their jurisdictions of sound meat under the pretense that it may be damaged or decayed, or Texan cattle for fear they may be diseased, or spirituous or malt liquors for fear that they may intoxicate, or oleomargarine for fear it may be adulterated. R. Co. v. Husen, 95 U. S. 465 [24 L. Ed. 527]; Bowman v. Chi. & N. W. R. Co., 125 U. S. 465 [8 Sup. Ct. 689, 1062, 31 L. Ed. 700]; Leisy v. Hardin, 135 U. S. 100 [10 Sup. Ct. 681, 34 L. Ed. 128]; Schollenberger v. Pennsylvania, 171 U. S. 1 [18 Sup. Ct. 757, 43 L. Ed. 49]. But to this power delegated to Congress there exist certain exceptions. The articles of commerce must be merchantable and of the character represented. The states, under the police powers reserved to them, may inspect and reject that which would be injurious to the public health or public morals, and that which was designed to cheat or defraud the people. They may, consequently, inspect meats, and exclude such as has become damaged and unwholesome; they may inspect Texan cattle, and exclude those that are in fact diseased; they may inspect spirituous or malt liquors, and exclude such as are adulterated with poisonous or noxious chemicals injurious to public health; and they may inspect oleomargarine, and exclude that which is colored in imitation of yellow butter, and represented to be such."

In People v. Biesecker, 169 N. Y. 53, 61 N. E. 990, 57 L. R. A. 178, 88 Am. St. Rep. 534, it is held that the prohibition in the agricultural law against using any preservative in dairy products, aside from salt in butter and cheese, and liquor in club cheese, is unconstitutional; the court saying (page 56, 169 N. Y., page 990, 61 N. E., 57 L. R. A. 178, 88 Am. St. Rep. 534):

"Still, the power has its limitations, and those limitations have been, to a large extent, determined by the process of exclusion and inclusion, as the courts have upheld particular cases of legislation as valid exercises of the power, and in other cases have declared the legislation void. In People v. Marx, 99 N. Y. 377 [2 N. E. 29, 52 Am. Rep. 34], a statute absolutely prohibiting the manufacture and sale of oleomargarine or any compound as a substitute for butter and cheese was held void. The statute, having been subsequently amended so as to prohibit the manufacture or sale of any article so compounded as to imitate butter, was upheld in People v. Arensberg, 105 N. Y. 123 [71 N. E. 277, 59 Am. Rep. 483], as valid legislation to prevent fraud on purchasers and consumers. In People v. Kibler, 106 N. Y. 321 [12 N. E. 795], a statute defining what should be deemed unwholesome or adulterated milk, and prohibiting its sale, was held constitutional. In People v. Girard, 145 N. Y. 105 [39 N. E. 823, 45 Am. St. Rep. 595], a statute forbidding the manufacture or sale of vinegar containing any artificial coloring matter was also held valid. From these cases the following propositions may be deduced: (1) That the Legislature cannot forbid or wholly prevent the sale of a wholesome article of food. (2) That legislation intended and reasonably adapted to prevent an article being manufactured in imitation or semblance of a well-known article in common use, and thus imposing upon consumers or purchasers, is valid. (3) That, in the interest of public health, the Legislature may declare articles of food not complying with a specified standard unwholesome, and forbid their sale. Though these principles, like most legal principles, are true only within limits, there would not seem much chance of conflict in their practical application, except between the first and last."

People ex rel. Tyroler v. Warden, etc., 157 N. Y. 116, 51 N. E. 1006, 43 L. R. A. 264, 68 Am. St. Rep. 763, holds the law prohibiting the sale of passage tickets, except by common carriers or their specially authorized agents (and which was evidently made to prevent frauds), unconstitutional, as depriving a citizen of his liberty and property, saying (page 130, 157 N. Y., page 1011, 51 N. E., 43 L. R. A. 264, 68 Am. St. Rep. 763):

"Under the law of this state, therefore, it is the duty of the courts to examine legislation complained of as in violation of the rights secured to the citizen

by the Constitution, for the purpose of ascertaining whether the health, morals, safety, or welfare of the public justifies its enactment."

In Plumley v. Massachusetts, 155 U. S. 462, 15 Sup. Ct. 154, 39 L. Ed. 223, a state law prohibiting the sale of imitation butter was held valid as tending to prevent fraud. But in Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49, a statute prohibiting the sale or possession of oleomargarine was held invalid as prohibiting the sale of a pure and wholesome article, and not aimed at the impure or fraudulent only; the court saying at page 19, 171 U. S., page 764, 18 Sup. Ct., 43 L. Ed. 49:

"We think that what Congress thus taxes and recognizes as property subject to commerce cannot be totally excluded from any particular state simply because the state may choose to decide that, for the purpose of preventing the importation of an impure or adulterated article, it will not permit the introduction of the pure and unadulterated article within its borders upon any terms whatever."

Referring to the dissenting opinion in the Buffalo Fish Co. Case, we see an attempt to distinguish that case from Schollenberger v. Pennsylvania by saying that the latter case dealt with a law which "prevents the introduction of a perfectly healthful commodity merely for the purpose of in that way more easily preventing an adulterated and possibly injurious article from being introduced," while in the former case, "if importations may be excluded which affect the public health, they may be excluded if tending to endanger the enforcement of a law intended to protect and preserve the people's property right in game fish," thus ignoring entirely the fact that the imported fish prohibited are perfectly harmless in every sense, and their use can only be beneficial, while in matters affecting the public health the prohibited thing is noxious and a direct instrument for committing a wrong. Property cannot be destroyed by law in order to prevent and discourage larceny. Why was it not attempted to prohibit the possession of the only practical means of capturing game and fish, such as firearms, fishing tackle, nets, and snares, during the closed season, or compel the owner to give a bond that he would not use them for any purpose during that time, and would not in any way violate the game law? It would be clear that such a statute would be unconstitutional, but it is thought that for some reason the state may deal with fish or game captured outside of the state differently than with other property.

The general trend of the authorities is with the prevailing opinion of the Court of Appeals in the Buffalo Fish Co. Case, and the later expressions of that court in the Biesecker Case and in Crossman v. Lurman seem to recognize the more recent limitations upon the police power of the state when it is dealing with subjects prohibited by the state or national Constitution. The constitutional prohibitions deprive the state from doing the prohibited acts. The police power enables it to preserve the health, morals, safety, and public good, not by doing the acts which the supreme law says shall not be done, but by throwing around the personal and property rights secured by it such reasonable regulations and limitations as will require every citizen to use such rights in such a manner as the public good makes necessary;

but it cannot destroy or prevent the possession of, or reasonable use of, private property, not noxious, and the only possible use of which is beneficial to the user, and brings no injury to health, morals, or the public safety, and does not tend to cheat or defraud the public. The courts had some difficulty in deciding that nets set in prohibited waters could be destroyed as a nuisance. Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; Id., 119 N. Y. 226, 23 N. E. 878, 7 L. R. A. 134, 16 Am. St. Rep. 813. But the reasoning of that case would not sustain a law making a man a criminal if he had a net in his house or barn for an innocent purpose, or was engaged in the manufacturing of nets.

The state is destroying this article of food, not as a matter of necessity, but rather as a matter of economy. If it is necessary to protect from the poacher the few remaining trout streams or ponds, they should be more effectively policed, or the use of the implements for their invasion regulated. The provisions of this law are not a reasonable exercise of the police power, but deprive the citizen of his property in fish as an article of commerce, and prevent foreign and interstate commerce.

But there is a broader reason for the invalidity of this law, and one nearer home. It is not only void under the commerce laws of the United States Constitution, but is in conflict with the state Constitution, as depriving the owner of his property and liberty. Much confusion and uncertainty is found in the session laws and the decisions in relation to game and game fishes, which comes in a great part from not considering the quality of the title which the possessor has in such property. There are two kinds or qualities of such title, depending upon the place of capture and possession. The game and game fishes in the state are the property of the whole people, and the lawmaking power may permit or prohibit their capture, and, if permitting, may impose such terms and conditions not only as to the capturing, but as to the disposition and use of the same, as it may choose. This arises from the state's right to dispose of the people's property. "From the earliest traditions the right to reduce animals feræ naturæ to possession has been subject to the control of the lawgiving power." Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793. "The wild game within a state belongs to the people in their collective, sovereign capacity. It is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for the protection or preservation of the public good." Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129. In Geer v. Connecticut, supra, it was held that a state law prohibiting the capturing of game for shipping out of the state was valid, and not interfering with interstate commerce, as the people owned the game, and could properly impose their own terms and conditions upon its capture; that the title to the game was subject to such conditions, and therefore it never became a subject for interstate commerce. Property taken from the owner upon condition is subject to that condition, and the taker and the possessors with notice take it with such condition at-

tached. The state may therefore impose its conditions upon which its game may be captured, and no one who takes the privilege can question the condition. Such privileges being granted by legislation, and all persons presumably knowing the law, the conditions follow the game, and no person receiving it can complain because its possession is declared unlawful. Most of the game laws and decisions, while not always based upon this conditional title, are consistent with and sustained by it. But when game is obtained outside the state, and brought into it as private property, the owner does not get his right to it from the state. He holds it independent of the state, the same as he owns his house, his cattle, or securities. He is the absolute, unqualified owner of property protected by the Constitution, and just as sacred from encroachment from the state as from others. The state may regulate its use so that the public health, morals, and safety shall not suffer therefrom, or the citizen be defrauded thereby, but it cannot prohibit entirely its use, or make him a criminal because he is able to own it. It is sometimes assumed that, because the state can prohibit the possession of state game during the closed season, it can prohibit the possession of game from outside the state; but we see the right to the one is derived from the state, and the title is conditional, while as to the other the title is absolute and unconditional, and it is property in every sense of the word. So long as it remains wholesome and a valuable article of food, the property is sacred, and no person—not even the state—can question its possession or proper use.

Two cases decided before the nature of the title to game and game fishes was as well understood as at present may at first seem to disregard the distinction drawn between state and foreign game. In Phelps v. Racey, 60 N. Y. 10, 19 Am. Rep. 140, the plaintiff's demurrer to the answer alleging that game was either caught in the open season, or outside of the state, where the killing was legal, was properly overruled. The alternative allegation that it was either caught outside of the state, or killed in the open season, did not require an adjudication as to foreign game, for, if either of the alternatives was insufficient, the answer was bad. It is true, the court assumed that it made no difference where the game was caught. So far as the decision in that case holds that the statute applies to foreign-caught game, it is overruled by the Buffalo Fish Company Case. It is also overruled so far as it declares that the foreign commerce clause of the United States Constitution is not applicable where Congress has not regulated the particular subject. So in fact there is very little left of that case. The only question it could and did decide was that the law prohibiting the possession of state game during the closed season is valid, even though it was caught during the open season—a proposition generally conceded.

In People v. Gerber, 92 Hun, 554, 36 N. Y. Supp. 720, the court says but one question is to be decided, and that is whether a proper construction of the statute in question exempts the possession of foreign-caught game, or game caught in the open season, during the whole closed season, or only from November 1st to November 15th. The question here considered was not before the court, or passed up-

on by it. We find no authoritative decision upon this question in our state, and probably for the good reason that heretofore no attempt has been made by the state to protect the game or fish of other states or countries.

Confined in the defendant's cold storage warehouse, and only suffered at large securely packed with ice in a strong box, these trout, dead and frozen (wholesome, but strangers in a strange land), did not endanger the public health, the public morals, or the public safety. In their helpless condition, the police power of the state could properly lie dormant. They were powerless to do wrong, or to be used as an instrument of wrong, but could only benefit and nourish mankind. By harboring them the defendant did not become a criminal, but exercised a constitutional right of property. Every citizen has the right to import and place upon his table for his family use any article of food known to be wholesome, and any law which deprives him of that right infringes upon the liberty guarantied to him by the Constitution.

We therefore hold that section 141 of the game law, prohibiting the possession of game or game fishes caught outside the state of New York, is void, as depriving the citizen of the rights of property and liberty guarantied to him by the state Constitution.

The Canadian law prohibits the possession of trout between September 15th and May 1st in Ontario, and the orders in council prohibited the shipping of trout out of the Dominion. This was a proper regulation to limit the use of its trout to the wants of its people. Nevertheless these trout were imported into this country pursuant to the laws of the United States. While our government will not aid or encourage a violation of a law of a foreign country, it is not called upon to enforce or to aid in enforcing its police regulations as to its internal affairs. When imported the trout were outside of the provisions of the Canada law, and the possessor is not charged with any conditions attached to the possession by such law. A party wrongfully obtaining possession of the trout from the defendant could not defend upon the ground that they were illegally shipped from Canada. No individual, nor the state itself, can question here the defendant's absolute property in the fish, or gain any advantage from the fact that the Canadian law designed its game and game fishes for its own people only. Lotteries and the possession or sale of lottery tickets are prohibited by the laws of Texas and California; but it is held that a person engaged in transporting lottery tickets from one of those states to the other commits a crime under the United States statute prohibiting such transportation, upon the ground that such transportation is interstate commerce. Lottery Case (Champion v. Ames) 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492. Some of the judges placed their dissenting opinion upon the ground that, the tickets being forbidden by the laws of both states, they were not commerce, but worthless paper, representing an interest in an illegal scheme. Page 371, 188 U. S., 23 Sup. Ct. 321, 47 L. Ed. 492. The dissenting opinion shows the illegality of the tickets in both states. Clearly, then, these trout, a recognized valuable article of commerce, are none the less so because their shipment from Can-

ada is prohibited, and are none the less property for that reason. Neither has the state the right to deprive the citizen of this useful article of food because it was wrongfully shipped from Canada, so long as it was introduced into the state by the authority of the laws of the United States.

The complaint should therefore be dismissed.