### PEOPLE v. BOOTMAN et al.

(Supreme Court, Appellate Division, First Department. June 17, 1904.)

1. GAME LAW—PENALTY—INSTRUCTION—POSSESSION OF GAME.

Laws 1900, p. 26, c. 20, § 22, as amended by Laws 1901, p. 1078, c. 396, fixes the close season for quail, while section 23 of said act of 1900, p. 27, as amended by chapter 601, p. 1333, fixes the close season for grouse and woodcock. Section 28 provides that woodcock, grouse, and quail shall not be sold or possessed during the close season, except in the month of December, and that the possession or sale thereof during the last 15 days of December shall be presumptive evidence that they were unlawfully taken by the possessor. Section 39, p. 29, as amended by chapter 741, p. 1591, of the Laws of 1900, declares the person violating any provision under this act guilty of misdemeanor and liable to a penalty of $60, and to an additional penalty of $25 for each bird or part of bird taken or possessed in violation thereof. *Held*, that the sections must be construed together, and that the first sections relate to such game unlawfully taken within the state, and only the sale or possession of such birds during the close season violates the laws, and the statute was not intended to affect the possession or sale of birds taken in another state, the ownership of which had been acquired, and which had been followed by importation into this state, while such importation and possession were lawful.

2. COSTS—SPECIAL ALLOWANCE.

Under Code Civ. Proc. § 3253, subd. 2, providing that in a difficult or extraordinary case, where defense has been interposed, the court may, in its discretion, award to any party a further sum as costs, not exceeding 5 per cent. of the sum "recovered or claimed," or the value of the subject-matter, an allowance in a case where there was no recovery, and which was justified as to amount by the amount of the judgment demanded by the pleadings, after eliminating causes of action as to which demurrer had been sustained, will not be disturbed.

McLaughlin, J., dissenting.

Appeal from Trial Term, New York County.

Proceedings by the people against Jacob V. Bootman and Howard R. Robinson. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Frank S. Black, for the People.
Louis Marshall, for respondents.

INGRAHAM, J.  This action was brought to recover. penalties for a violation of the forest, fish, and game law (chapter 20, p. 26, of the Laws of 1900); the defendants being charged with the possession of various birds at different times between May 23, 1901, and June 1, 1901.  The defendants demurred to this complaint, and the demurrer was sustained as to counts 14 to 19 of the complaint, inclusive, and overruled as to counts 1 to 13, inclusive.  40 Misc. Rep. 27, 81 N. Y. Supp. 195.  Both parties seem to have appealed to this court, where the judgment below was affirmed without an opinion.  72 App. Div. 619, 76 N. Y. Supp. 1022.  And on a subsequent appeal to the Court of Appeals the judgment was affirmed upon the opinion of the Special Term.  173 N. Y. 622, 66 N. E. 1113.  The case then came on for trial before a jury, and was submitted upon an agreed statement of facts.  It was stipulated that the defendants, "between the 22d day of May, 1901, and the 2d day of June of that year, possessed at the city and county of New York 100 grouse, 100 quail, 96 woodcock, and 100 ducks,. being of the same grouse, quail, woodcock, and ducks mentioned and described in the first thirteen counts of the complaint in the above-entitled action"; that "all of the said grouse, quail, woodcock, and ducks were caught and killed outside of the state of New York, to wit, in other states of the Union, and were purchased and acquired by the defendants, and exported from the states in which they were caught and killed to them in this state, at a time when it was lawful to possess them in the state of New York, to wit, during the month of November, 1900, and that the defendants received and kept the same on storage at the county and city of New York from that time to the commencement of this action; and that they were of the fair market value of five thousand ($5,000) dollars."  Upon the trial the complaint was dismissed, and the plaintiff appealed.

The first 13 counts of the complaint were alike in form, except as to the specific birds and the time.  The first count alleged that "on the 23d day of May, 1901, at the city and county of New York, the defendants, copartners as aforesaid, unlawfully, willfully, and knowingly possessed four hundred and ninety-six (496) grouse and two hundred and thirty-six (236) quail during the close season for said grouse and quail, respectively, contrary to the form of. the statute in such case made and provided; that by reason of the premises the defendants then and there became liable to a penalty of sixty dollars, and to .an additional penalty of twenty-five dollars for each bird, grouse, and quail so possessed, to wit, the sum of eighteen thousand. three hundred dollars."  These counts were held to state facts sufficient to constitute a cause of action.  Upon the trial it appeared that these birds had been taken out of the state of New York, purchased by the defendants outside of the state, and imported into this state. at a time when. persons in this state were authorized to take such birds and have possession thereof, and the birds had remained in the possession of the defendants, in the original packages, from the time of such importation until the time the complaint alleged that the defendants possessed the same.  The defendants having thus lawfully become the owners of these birds at the time when the pos-

session and ownership of such property was authorized by the law of this state, the question is directly presented as to whether the Legislature could make the subsequent possession of these birds a crime. That these birds thus acquired by the defendants, and imported into this state when such importation was allowed by the law of this state, were property, cannot be seriously questioned. It is agreed that they were of the value of $5,000, and, when purchased and imported into this state by the defendants, neither the state, nor any one acting under its authority, could confiscate or appropriate this property without making compensation to the defendants therefor. They were protected by the provisions of the state Constitution, subject, however, to the police power of the state, which would include the right of the state to prevent the sale of articles of food which would be injurious to the public health. Subject to this power, however, the defendants had a right to possess the birds, to sell them, or make such disposition of them as they pleased. It was held by the learned judge who determined the demurrer in this case, which opinion was adopted by the Court of Appeals, that the possession of birds at the forbidden season within the state is prima facie evidence that the possessor had violated the law, and that the burden was then cast upon him to show that the possession was legal. Thus upon the trial of the case there was imposed upon the defendants, to escape liability, the obligation of showing that the possession of these birds in May and June, 1901, was not a violation of the statute; and the question is therefore presented whether the provisions of this law require us to hold that the Legislature intended to make the mere possession of property to which the possessor had the legal title a crime, and whether, if the Legislature intended to accomplish that result, it was in violation of the provisions of the Constitution. Section 6 of article 1 of the Constitution provides that no person shall "be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation." Since this provision has been a part of the fundamental law of the state, it has been universally held that the possessor of property is entitled to its full beneficial use and free enjoyment, and that such use and enjoyment of property cannot be directly or indirectly affected, except by due process of law. Thus, in Forster v. Scott, 136 N. Y. 577, 32 N. E. 976, 18 L. R. A. 543, the court said what it seems to me is directly applicable to the questions presented in this case:

"This case is governed by a few principles so well settled and understood that they are elementary, and nothing can be added to their force or application by illustration or extended discussion. The validity of a law is to be determined by its purpose and its reasonable and practical effect and operation, though enacted under the guise of some general power which the Legislature may lawfully exercise, but which may be, and frequently is, used in such a manner as to encroach, by design or otherwise, upon the positive restraints of the Constitution. What the Legislature cannot do directly it cannot do indirectly, as the Constitution guards as effectually against insiduous approaches as an open and direct attack. Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value, without legal process or compensation, it deprives him of his property, within the meaning

of the Constitution. All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must, in terms or in effect, authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment, or the power of disposition at the will of the owner."

If the free beneficial use and right of disposition of property are thus protected by the Constitution, an act which makes the mere possession of property a crime, and imposes upon the possessor a penalty, is certainly a direct legislative interference with the beneficial use and liberty of disposition of the property. If an act of the Legislature attempted to make the mere possession of a barrel of flour or a bushel of wheat a crime, there could be, I suppose, no question but that it would be a violation of this clause of the Constitution. Matter of Jacobs, 98 N. Y. 98–105, 50 Am. Rep. 636, and cases there cited. Wherever these birds became the property of the defendants, and lawfully possessed within this state, it seems to me that such ownership and possession were as much protected by the Constitution as was any other kind of property similarly situated, and that, if the construction sought to be given to this statute by the learned counsel for the plaintiff is correct, it was beyond the power of the Legislature.

I have not considered the act of Congress of May 25, 1900 (31 Stat. 187, c. 553 [U. S. Comp. St. 1901, p. 3181]), as that act could only have the effect of preventing the provision of the federal Constitution as to interstate commerce from applying to property of this character imported into this state. It did not and could not affect the application of the Constitution of this state, which prohibits the Legislature from depriving a person of property without due process of law. It may be conceded that, since the passage of this act of Congress, these birds, when imported into this state from any other state or territory, became subject to the operation and effect of the laws of this state, enacted in the exercise of its police power, to the same extent and in the same manner as though such birds had been produced in this state, but that act certainly could not abrogate the provisions of the state Constitution which prohibit the Legislature from depriving the plaintiff of this property without due process of law. Entertaining these views, we have to examine the statute to see whether it must necessarily be construed so as to accomplish what would be a violation of this constitutional provision.

Section 22 of the act (chapter 20, p. 26, of the Laws of 1900, as amended by chapter 396, p. 1078, of the Laws of 1901) provides that the close season for quail shall be from December 16th to October 31st, both inclusive. Section 23, p. 27, as amended by chapter 601, p. 1333, of the Laws of 1900, provides that woodcock shall not be taken from December 16th to September 15th, both inclusive. Section 25, p. 27, as amended by chapter 601, p. 1333, of the Laws of 1900, provides that the close season for grouse shall be from December 16th to September 15th, both inclusive. Section 28, p. 27, provides that woodcock, grouse, and quail shall not be sold or possessed during the close season, except in the month of December, and the

possession or sale thereof during the last 15 days of December shall be presumptive evidence that they were unlawfully taken by the possessor. Section 39, p. 29, as amended by chapter 741, p. 1591, of the Laws of 1900, provides that a person who violates any provision of this article is guilty of a misdemeanor, and is liable to a penalty of $60, and to an additional penalty of $25 for each bird or part of bird taken or possessed in violation thereof. Substantially the same provisions are contained in article 3 of the act in relation to certain fish. The provisions of article 3 were before the Court of Appeals in the case of People v. Buffalo Fish Co., 164 N. Y. 93, 58 N. E. 34, 52 L. R. A. 803, 79 Am. St. Rep. 622. The appeal in that case presented, as this case presents, two questions—first, "with respect to the true meaning and scope of the statute; and, secondly, if it means what the plaintiff insists it does, with respect to its validity;" and it was held that:

"The statute in question does not in terms, or by any reasonable implication, forbid a person to 'catch, kill or be possessed' of fish in a foreign country. We all agree that our statute does not forbid a person to catch or kill fish of any kind in Manitoba, but it is said that, when one brings the fish so caught or killed into this state, the penalties of our statute attach to him. With all respect, I am constrained to say that this is not a reasonable or tolerable interpretation of a penal statute. What it means, and all it means, is to forbid any person to catch, kill, or be possessed of the fish described from the waters of this state. The word 'possessed' obviously refers to those fish, the catching or killing of which is forbidden; that is to say, fish in the waters of this state, and not those procured in a foreign country. It is simply a perversion of the statute to hold that the mere possession by any person within this state of the fish described in the statute during the close season is a violation of it, without regard to the place where it was procured, or to the manner obtained. * * * In the case at bar the statute is pushed by a literal reading to a point quite as unreasonable. In my opinion, the law has no reference or application to a case where the fish have been imported from a foreign country. The conceded facts of this case take it out of the reason and policy of the law."

We have thus stated for our guidance by the Court of Appeals a rule of construction which can be applied to this statute, and which saves it from being a violation of the constitutional provision to which attention had been called. The Legislature had implied authority to protect the wild game of the state. To accomplish that purpose, it prohibited the taking of certain birds during a certain portion of each year, and then provided that these birds should not be sold or possessed during the close season, and provided a penalty for a violation of this prohibition. Reading these sections together, they can be construed, in accordance with the intent of the statute, to apply to certain specified birds taken within the state, and that the sale or possession of such birds during the close season is a violation of the provision of the law, and imposes upon the possessor the penalty therein prescribed; but the statute was not intended to, nor does it, affect the possession or sale of birds taken in another state or country, the ownership of which had been acquired, and which had been followed by importation into this state, while such importation and possession were lawful and vested in the possessor the title to the property.

Our attention has been called to a case at the Special Term of the Supreme Court (People v. A. Booth & Co., reported in 42 Misc. Rep. 321, 86 N. Y. Supp. 272) in which this question is quite fully discussed, and where a conclusion is arrived at which substantially agrees with that before indicated. I also think that the court had power to grant the allowance.

The complaint demanded judgment for an amount exceeding $1,-000,000. The elimination of the causes of action by the judgment sustaining in part the demurrer left a demand against the defendants of several hundred thousand dollars. They were compelled to meet that demand on the trial. The stipulation that the defendants agreed to showed that the action could not have been brought for that amount. Subdivision 2 of section 3253 of the Code of Civil Procedure provides that the court may, in its discretion, award to either party "a sum not exceeding five per cent. upon the sum recovered or claimed." There was no recovery. So the amount must be based upon the sum claimed, and the sum claimed was the amount of the judgment demanded by the pleadings, and that amount, eliminating the causes of action as to which the demurrer was sustained, would justify the allowance granted.

It follows that, upon the agreed statement of facts, we agree with the learned judge below, and that the judgment should be affirmed, with costs.

PATTERSON and O'BRIEN, JJ., concur.　VAN BRUNT, P. J., concurs in result.

McLAUGHLIN, J. (dissenting). I am unable to concur in the prevailing opinion. The possession of the birds at the time alleged in the complaint and stated in the stipulation was, under the forest, fish, and game law (chapter 20, § 22, p. 26, Laws 1900, as amended by chapter 396, p. 1078, Laws 1901), unlawful (Id. §§ 22, 23, 25, and 28), and by reason thereof the defendants were liable to the penalty specified in section 39 (p. 29) of that act. The act is not unconstitutional. Phelps v. Racey, 60 N. Y. 10, 19 Am. Rep. 140; People v. Buffalo Fish Co., 164 N. Y. 93, 58 N. E. 34, 52 L. R. A. 803, 79 Am. St. Rep. 622. Nor is it in conflict with the federal Constitution or acts passed by Congress regulating commerce between the states. Matter of Rahrer, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572; Rhodes v. State of Iowa, 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088; Vance v. W. A. V. Co., 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100.

The prevailing opinion entirely overlooks or ignores section 5 of the act of Congress commonly called the "Lacey Act," approved May 25, 1900 (31 Stat. 187, c. 553 [U. S. Comp. St. 1901, p. 3181]), and, if it had not, then it seems to me clear a different conclusion would have been reached. This section provides:

"That all dead bodies or parts thereof, of any foreign game animals, or game or song birds, the importation of which is prohibited, or the dead bodies or parts thereof of any wild game animals or game or song birds transported into any state or territory or remaining therein for use, consumption, sale or

storage therein, shall, upon arrival in such state or territory, be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers to the same extent and in the same manner as though such animals or birds had been produced in such state or territory and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

It is true that the validity and effect of the section quoted have not, so far as I have been able to discover, been judicially passed upon, but a similar act of Congress in respect to intoxicating liquors has. The "Wilson Act," so-called, approved August 8, 1890 (26 Stat. 313, c. 728, § 1 [U. S. Comp. St. 1901, p. 3177]), provides:

"That all fermented, distilled or other intoxicating liquors or liquids transported into any state or territory or remaining therein for use, consumption, sale or storage therein, shall, upon arrival in such state or territory, be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory and shall not be exempt therefrom by reason of being introduced in the original packages or otherwise."   26 Stat. 313, c. 728 [U. S. Comp. St. 1901, p. 3177.]

This Act was first considered by the Supreme Court of the United States in Matter of Rahrer, supra, in relation to a statute of the state of Kansas, which provided that any person who should manufacture, sell, or barter any spirituous liquors should be guilty of a misdemeanor, and upon conviction should be punished as therein provided. 1 Gen. St. Kan. 1889, c. 31, § 380, etc.   On the day following the approval of the Wilson act—August 9, 1890—one Rahrer sold, in the state of Kansas, a keg of beer in the original package in which it had been transported to him from another state.   He was arrested for violating the statute of Kansas referred to, and thereupon, by writ of habeas corpus, he obtained his discharge (In re Rahrer [C. C.] 43 Fed. 556, 10 L. R. A. 444); but on appeal the action of the lower court was reversed, and the relator remanded as subject to and to be proceeded against for a violation of the state statute.   In disposing of the case the court held that the Wilson act was constitutional, and, after it took effect, liquors imported into the state of Kansas were subject, both as to possession and sale, to the existing laws of that state, and it was unnecessary, after the passage of the Wilson act, to re-enact the state law in order to make it operative upon such liquors.   Chief Justice Fuller, speaking for the court, said:

"It appears from the agreed statement of facts that this liquor arrived in Kansas prior to the passage of the act of Congress, but no question is presented here as to the right of the importer in reference to the withdrawal of the property from the state, nor can we perceive that the congressional enactment is given a retrospective operation by holding it applicable to a transaction of sale occurring after it took effect.   This is not the case of a law enacted in the unauthorized exercise of a power exclusively confided to Congress, but of a law which it was competent for the state to pass, but which could not operate upon articles occupying a certain situation until the passage of the act of Congress.   That act, in terms, removed the obstacle, and we perceive no adequate ground for adjudging that a re-enactment of the state law was required before it could have the effect upon imported which it had always had upon domestic property."

The same act again came under consideration in Rhodes v. State of Iowa, 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088.   There Rhodes

was convicted before a justice of the peace of the state of Iowa for transporting into that state, in violation of its laws, intoxicating liquors from the state of Illinois. The conviction was affirmed by the Supreme Court of Iowa (State v. Rhodes, 90 Iowa, 496, 58 N. W. 887), but reversed by the Supreme Court of the United States, on the sole ground, however, that the liquors when seized had not reached their destination. Referring to the contention that the statute of Iowa did not apply to liquors obtained outside of the state, Mr. Justice White, citing with approval Matter of Rahrer, supra, said:

"It is not gainsaid that the effect of the act of Congress [with respect to imported liquors] was to deprive the receiver of goods shipped from another state of all power to sell the same in the state of Iowa in violation of its laws. * * * It has been settled that the effect of the act of Congress is to allow the statutes of the several states to operate upon packages of imported liquor before sale."

It was also considered in Vance v. W. A. V. Co., supra. There an injunction had been obtained restraining the defendants from interfering with intoxicating liquors shipped from the state of California to the state of South Carolina in violation of the statutes of the latter state. The court held that the injunction should be dissolved; that under the Wilson act intoxicating liquors transported from one state to another became, as soon as the act of transportation was complete, subject to the laws of the state into which they were brought.

Applying the rule laid down in these decisions, as to the effect of the Wilson act upon state statutes existing at the time of its passage with reference to intoxicating liquors, to the Lacey act, and its effect upon the statute of this state as to the possession of game, but one conclusion, as it seems to me, can be reached, viz., that the defendants were liable to the penalty provided by the statutes of this state for having the birds mentioned in the stipulation at the time therein stated, and this notwithstanding the fact they were in the original packages in which they were received from other states.

The Wilson and Lacey acts are similar, except one relates to intoxicating liquors, and the other to game. The Kansas statute, which was involved in the decision in the Rahrer case, provides that intoxicating liquors shall not be manufactured or sold in that state, and the New York statute, under which the penalties here are sought to be recovered, provides that birds of the kind mentioned in the stipulation shall not be sold or possessed at stated times. Both of these statutes were passed in the exercise of the police powers of the respective states, and, after they became laws, one applied to liquors produced, and the other to game taken, in the state, but neither of them to that which was transported into the state until after Congress had given its consent thereto. Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128. That consent, however, was given by acts which might well be termed enabling acts—the Wilson act in the one case, and the Lacey act in the other—and thereafter the state statutes applied equally to that which came from without as to that produced or taken within it. There is therefore no force in the suggestion that the Lacey act has no application, since the statute of the

state of New York under which the penalties are sought to be recovered was passed prior thereto. The statute is general in terms. It applies, so far as the possession of the birds mentioned during the closed season is concerned, to those taken or procured outside of the state, as well as to those taken within it, and Congress has given its consent, by the Lacey act, to the enforcement of that statute against birds imported into the state. This same contention was made in the Rahrer Case, and the court, as already indicated, held that a reenactment of the state statute was unnecessary, and the same view was reiterated in the Rhodes and Vance Cases. This is also the view of the court of last resort in every state, so far as I have been able to discover, where the question has been presented. State v. Intoxicating Liquors, 95 Me. 140, 49 Atl. 670; Starace v. Rossi, 69 Vt. 303, 37 Atl. 1109; State v. Bixmam, 162 Mo. 1, 62 S. W. 828. See, also, Commonwealth v. Savage, 155 Mass. 278, 29 N. E. 468; Magner v. People, 97 Ill. 320; Roth v. State, 51 Ohio St. 209, 37 N. E. 259, 46 Am. St. Rep. 566; People v. O'Neill, 110 Mich. 324, 68 N. W. 227, 33 L. R. A. 696; State v. Rodman, 58 Minn. 393, 59 N. W. 1098; Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129; Price v. Bradley, 16 Q. B. Div. 148.

Nor do these views conflict in any way with People v. Buffalo Fish Company, supra, as I read that case. There the court held that the statute here under consideration was constitutional, but, so far as fish was concerned, it only applied to that taken within the state. This was but applying the rule laid down in Leisy v. Hardin, supra, and it must necessarily be so, inasmuch as there was no act of Congress making imported fish subject to the laws of the state into which it was imported. The case would be in point except for the Lacey act. That act, as already said, makes the state statute applicable to game imported into the state.

I am of the opinion, in view of the authorities cited, that the defendants are liable for the penalty provided in the statute for having the birds unlawfully in their possession, and, if I am correct in this, then it necessarily follows the judgment should be reversed. If, however, the conclusion is incorrect, then it seems to me the judgment should be modified by reducing the extra allowance from $2,000 to $498. The court, under section 3253 of the Code of Civil Procedure, made an extra allowance of $2,000 as costs. There is no basis for such an award. This section provides that a sum not exceeding 5 per cent. on the sum recovered or claimed, or the value of the subject-matter involved, may be awarded. Under the stipulation the total amount claimed was $9,960—a penalty of $60, and an additional penalty of $25 for each of the 396 birds mentioned. Five per cent. of this sum is $498, and that is all that could be awarded.