McDONALD & JOHNSON et al. v. SOUTHERN EXPRESS CO.

(Circuit Court, D. South Carolina. December 30, 1904.)

1. FISH—STATE REGULATIONS—STATUTES—CONSTITUTIONALITY.
   Act S. C. Feb. 16, 1904 (24 St. at Large, p. 385), prohibiting the shipment or transportation of "any shad fish beyond the limits of" the state, and declaring that any common carrier shipping or receiving for transportation any shad fish to points, beyond the state shall be guilty of a misdemeanor and fined, is unconstitutional and void, as prohibiting the transportation of shad fish caught beyond the limits of the state, which the state has no power to regulate.

2. SAME—CONSTRUCTION—PARTIAL CONSTITUTIONALITY.
   Since the Legislature, in passing Act S. C. Feb. 16, 1904 (24 St. at Large, p. 385), prohibiting the transportation of "any shad fish" beyond the limits of the state, distinctly refused to limit the act to shad fish caught within the limits of the state, it could not be construed by the courts to be so limited, and, as limited, held constitutional.

J. P. K. Bryan, for complainants.
Mordecai & Gadsden and U. X. Gunter, Jr., Atty. Gen. S. C., for defendant.

BRAWLEY, District Judge. An act of the General Assembly of South Carolina approved February 16, 1904 (24 St. at Large, p. 385),

declares, in section 1, "that on and after the 20th day of February, 1904, it shall be unlawful to ship or transport any shad fish beyond the limits of this state"; and in section 2, that "any person  *  *  *  who violates the provisions of section 1 of this act shall upon conviction be deemed guilty of a misdemeanor and subject to a fine not exceeding $100.00 or to imprisonment not exceeding 30 days"; and in section 3, that "any common carrier receiving any shad fish for transportation or shipment to any points beyond the limits of this state, shall, upon conviction be deemed guilty of a misdemeanor, and shall for each offence be fined not exceeding $100.00." Immediately after the passage of this act the defendant company, a corporation engaged in the business of transportation as an interstate common carrier, and theretofore carrying shad fish to places outside the limits of the state, gave notice that it would not, after February 20, 1904, receive for shipment or transport to points beyond the limits of the state any shad fish, whereupon complainants, six or seven in number, filed their bill of complaint, alleging, among other things, that they were dealers and shippers of shad fish caught within and without the limits of the state of South Carolina to places situated outside the limits of said state; that said shad fish was a recognized article of interstate commerce; that they had expended large sums of money in the equipment of their business, and had entered into contracts for daily shipments during the shad season; that the Congress of the United States had, by several statutes, provided for the propagation of shad fishes, and had expended large sums of money, and deposited many millions of shad fishes or shad fry in the coast waters of the United States for the benefit of the citizens of the United States, and that the act above mentioned was in contravention of article 1, § 8, of the Constitution of the United States. An interlocutory injunction was granted, and it was referred to the master to take testimony, and the case is now before me upon his report, and upon a motion for a permanent injunction; counsel for complainants appearing in behalf of said motion, and the Attorney General of the state in opposition.

The master reports that he held a reference October 7, 1904, at which were present the solicitor for the complainants, the solicitor for the defendant, Southern Express Company, associated with whom as counsel was the Attorney General of the state of South Carolina, and that the complainants and their witnesses being present and ready to give their testimony in the cause, it was agreed by the counsel for the complainants and the counsel for the defendant that the facts as alleged in the bill of complaint were admitted as true; counsel for the defendant stating that the issue was one of law, arising upon the face of the pleading. The facts as alleged being admitted, it was further agreed that during the pendency of the act set forth in the bill of complaint in the Legislature of the state of South Carolina an amendment was offered striking out the words "any shad fish," in section 1 of the act, and inserting in lieu thereof the words "any shad fish caught in the waters of the state of South Carolina," but the said amendment was rejected. It was stated by the counsel for the complainants in the argument before me, and not controverted, that he was prepared to prove by his witnesses that the greater part of the shad fish shipped

by complainants was caught beyond the limits of the state of South Carolina.

In Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793, the Supreme Court of the United States considers the nature of the property in game, and the authority which the state had a right to lawfully exercise in relation thereto, and, after reviewing the authorities from the time of Solon, holds that, from the earliest traditions, the. right to reduce animals feræ naturæ to possession has been subject to the control of the lawgiving power. The principle upon which this decision rests is that such animals belong to the collective body of people of the state, and are held by the state in trust for the people, and the person who takes the game can only acquire a qualified property in it; that such game not being the subject of private ownership, except in so far as the people may elect to make it so, the state may, if it sees fit, absolutely prohibit the taking of it, or traffic and commerce in it, if it is deemed necessary for the protection or preservation of the public· good.; that such common ownership imports the right to keep the property, if the sovereign so chooses, always within its jurisdiction for every purpose. The dissenting opinions of Justices Field and Harlan, while not questioning the right of the state, by its legislation, to provide for the protection of wild game, hold that such game, when beyond the reach or control of man, is not the property of the state, or of any one, in a proper sense, and that when man, by his labor or skill, brings any such animals under his control and subject to his use, he acquires, to that extent, his right of property in them; that, having thus, by labor or skill, added to the uses of man an article promoting his comfort, which without that labor would have been lost to him, he has an absolute right to it, and the state cannot interfere with his disposition of it; that such game thus reduced to his possession becomes an article of commerce; and that it does not lie within the province of any state to confine the excellencies of any articles of food within its borders to its own fortunate inhabitants, to the exclusion of others. Two other Justices took no part in the decision, but the opinion of the court settles the law that a state has the power to prohibit the exportation of game killed within the limits of the state. The statute of Connecticut which was under the review of the court forbade the transportation of "any such birds killed within this state," and the opinion of the Supreme Court uses the same words of limitation. The case under review related to woodcock and other birds, but there is no doubt that fish come within the general classification of game. Blackstone and Kent class them with animals feræ naturæ, and in this state it was so decided in State v. Higgins, 51 S. C. 53, 28 S. E. 15, 38 L. R. A. 561.

Whether the shad fish, owing to its peculiar nature, and to the circumstance that its presence within the waters of the state is due largely to the methods of propagation, and to the expenditure of moneys by the general government for the benefit of all the people of·the United States, should be differentiated from this classification, is an interesting question raised by the pleadings, and may be considered hereafter. Assuming that it is to be classed with other game as animals feræ naturæ, the property in which rests in the state, and that, under

the principle settled by Geer v. Connecticut, the state has the right to prohibit the exportation beyond its limits of any such fish caught within its borders, does such right exist as to any fish caught without its borders and brought within it? The source of title in such fish is not the state. There is no ownership by the state, or by the people in their collective capacity, in game or fish taken or killed outside the borders of the state, for it is not a food supply which belongs in common to all the people of the state, and which can only become the subject of ownership in a qualified way, as declared in that case. Therefore it seems to me clear that shad fish caught without the borders of the state are not subject to the limitations and restrictions that the state may impose on the ownership of fish caught within its borders.

In the Case of Davenport (C. C.) 102 Fed. 540, the petitioner, who kept a restaurant in the city of Spokane, in the state of Washington, was arrested and imprisoned for having in his possession and offering for sale quail which he had purchased in the state of Missouri. The statute upon which the prosecution was founded declared it to be a misdemeanor to offer for sale quail or other game therein described. The petitioner was discharged in habeas corpus proceedings, the court saying:

"I fully assent to the doctrine of these decisions holding that it is competent for state Legislatures to enact laws for the protection of game; and I do not question the decision of the Supreme Court of the United States in Geer v. Connecticut, holding that the Legislature of the state has the constitutional power to entirely prohibit the killing of game within the state for the purpose of conveying the same beyond the limits of the state, for it is true, and it is an elementary principle, that the wild game within the state belongs to the people in their collective, sovereign capacity. Game is not the subject of private ownership, except in so far as the people may elect to make it so, and they may, if they see fit, absolutely prohibit the taking of it for traffic or commerce in it; but the power of the Legislature in this regard only applies to game within the state, which is the property of the people of the state, and no such power to interfere with the private affairs of individuals can affect the right of a citizen to sell or dispose of, as he pleases, game which has become a subject of private ownership by a lawful purchase in another state. This decision of the Supreme Court does not directly or indirectly support the proposition that the Legislature of one state has the constitutional power to prohibit traffic in game imported from another state."

In People v. A. Booth & Company, 86 N. Y. Supp. 272, decided November, 1903, in the Supreme Court of New York, an action was brought to recover penalties under the fish and game laws of New York for having possession of, selling, and transporting brook trout out of season, imported from Canada and stored in cold storage, and cases in the state of New York are reviewed. Among them is the case of People v. Buffalo Fish Company, 164 N. Y. 100, 58 N. E. 36, 52 L. R. A. 803, 79 Am. St. Rep. 622, where the court says:

"The question, and the only question, is whether a state statute can be lawfully enacted to prohibit a citizen of this state from buying fish in Canada, importing it into this state, and exposing it for sale here. There is no question at all about the competency of the state, in the exercise of the police power, to enact game laws. The question is whether such laws can be so framed as to prohibit or restrict by penal provisions the importation of an article of food in universal use. That the purchase of fish for food in a foreign country, and its importation here for sale as such is a branch of

foreign commerce, is too clear for discussion. * * * That the statute operates as a restriction upon the defendant's business as an importer and· dealer in fish, no one can doubt. That a statute so operating is in conflict with the exclusive power of Congress to regulate foreign commerce, is not questioned, and yet the contention is made with great earnestness that this statute is perfectly valid. The reasoning upon which this conclusion is based, if I understand it, is that the state has the power to pass game laws, which no one denies; that the object of this statute was to protect game in this state, and not to interfere in any way whatever with foreign commerce, and, since the purpose that the Legislature had in view was lawful and laudable, the statute is good, although in fact it does prohibit or restrict the importation of fresh fish as an article of food. If the Legislature did not intend to restrict foreign commerce, as asserted, then it is obvious that the statute should be read and interpreted according to that intention, in which event it would have no applicaion to the facts of this case; but, strangely enough, it is given a meaning which imputes to the lawmakers just the contrary, since it is said that the possession of imported fish is, in terms, inhibited. The good intentions of a Legislature will not save a state statute from condemnation when it in fact conflicts with the supreme law of the land. If it restricts the application of commerce, as it certainly does, then it is void, no matter what name may have been given to it, or what good purpose it was intended to promote."

The court held in the Booth Case that, if it was necessary to protect trout streams, they should be more effectively policed, or the use of the implements for their invasion regulated, and that provisions of that law were not a reasonable exercise of police power, but deprived a citizen of his property in fish as an article of commerce, and says:

"But there is a broader reason for the invalidity of this law, and one nearer home. It is not only void under the commerce laws of the United States Constitution, but is in conflict with the state Constitution, as depriving the owner of his property and liberty. Much confusion and uncertainty is found in the Session Laws and the decisions in relation to game and game fishes, which comes, in a great part, from not considering the quality of the title which the possessor has in such property."

There are two kinds or qualities of such title, depending upon the place of capture and possession, and, citing Geer v. Connecticut and other cases holding that, game being the property of the whole people, the law might impose such terms and conditions as it chose, not only as to its capture, but as to the disposition and use of the same, and that, such privileges being granted by legislation, the conditions upon which it was granted followed the game, the court also says:

"But when game is obtained outside the state, and brought into it as private property, the owner does not get his right to it from the state. He holds it independent of the state, the same as he owns his house, his cattle, or securities. He is the absolute, unqualified owner of property, protected by the Constitution, and just as sacred from encroachment from the state as from others."

In considering similar legislation in the state of Pennsylvania, the court says in Commonwealth v. Wilkinson, 139 Pa. 298, 21 Atl. 14:

"The manifest object of this act was the preservation of game within this commonwealth. We cannot assume that it was intended to preserve game elsewhere, and it would be a forced construction to hold that it was intended to exclude from our markets quail and other game killed in other states,

where by the laws of those states the killing of it was lawful. * * * The law was not intended to have any extraterritorial effect, and if it was, it would be nugatory."

The same doctrine is announced in Maryland (Dickhaut v. State, 85 Md. 451, 37 Atl. 21, 36 L. R. A. 765, 60 Am. St. Rep. 332), in Massachusetts (Commonwealth v. Hall, 128 Mass. 410, 35 Am. Rep. 387), in Kansas (State v. Saunders, 19 Kan. 127, 27 Am. Rep. 98), and in other states.

There are decisions to the contrary in a number of states, the most notable of which is Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129, where the Supreme Court of California held that, in the exercise of the police power of the state, it may prohibit the taking of wild game, and any traffic or commerce in it, if deemed necessary for its protection or preservation of the public good, and, to this end, may make it criminal for any person to sell or offer for sale any of such game, whether killed within the state or without the state. These cases rest upon the principle stated by Lord Chief Justice Coleridge in Whitehead v. Smithers, 2 C. P. D. 553, where, under an English statute making it unlawful to have in possession plover during the close season, it was held that a party who imported the dead birds from Holland, and sold them in the British market, came within the prohibition of the statute, and the court said:

"It is said that it would be a strong thing for the Legislature of the United Kingdom to interfere with the rights of foreigners to kill foreign birds, but it may well be that the true and only mode of protecting British wild fowl from indiscriminate slaughter, as well as of protecting other British interests, is by interfering indirectly with the proceedings of foreign persons. The object is to prevent British wild fowl from being improperly killed and sold under pretense of their being imported from abroad."

It is hardly necessary to say that, the power of the British Parliament relating to questions of this kind being supreme, this case furnishes no rule of guidance in construing a statute of a state whose power in respect to all matters of interstate and foreign commerce is limited by the federal Constitution. The argument in favor of the validity of this statute is precisely that which was controlling in the English case just referred to; that is, that it would be impossible for the police officers of the state to determine whether the shad come from within or from without the state, and that it would be easier to enforce local protective and inspection laws if they were made applicable as well to fish caught without the state as to those caught within its borders. As a mere rule of convenience, this argument has weight, but the Supreme Court of the United States has definitely pronounced unconstitutional such local laws as are in restraint of interstate commerce. Thus, in the Oleomargarine Case, the state of Pennsylvania having passed an act making it a misdemeanor for any person to sell or have in his possession, with intent to sell, any imitation or adulterated butter or cheese, which the Supreme Court of that state sustained, in Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49, it was held by the Supreme Court of the United States that, inasmuch as oleomar-

garine was a recognized and proper subject of commerce, it could
not be totally excluded from any particular state simply because
the state may choose to decide that, for the purpose of preventing
an impure and adulterated article, it will not permit the introduc-
tion of a pure and unadulterated article within its borders upon any
terms whatever. The argument in favor of the statute was that it
was enacted in good faith for the protection of the health of the
citizens and for the prevention of deception, and that while it might
be admitted that there was actually pure oleomargarine, not danger-
ous to the public health, its purity could not be ascertained by any
superficial examination, and that, any certain and effective super-
vision of its manufacture being impossible, therefore all oleomarga-
rine should be excluded; but the court held that it was beyond the
power of the state to interfere with interstate commerce, and it
could not, for the purpose of preventing the introduction of an im-
pure or adulterated article, absolutely prohibit the introduction of
that which was pure and wholesome. This case is on the line of
many others where statutes passed under the cover of the exercise
of police powers were held unconstitutional, as being a burden upon
interstate or foreign commerce. Henderson v. Wickham, 92 U. S.
259, 23 L. Ed. 543; Chy Lung v. Freeman, 92 U. S. 275, 23 L. Ed.
550; Railroad Company v. Husen, 95 U. S. 465, 24 L. Ed. 527.

It being so clear upon principle and upon the most approved au-
thorities that the state has no power to prohibit the exportation of
game brought into the state from another state, or outside its borders,
it was suggested by the learned Attorney General at the hearing that the
act be so construed as to confine its operation to shad caught within the
limits of the state. Such interpretation would limit the words of
the act, and be manifestly against the intent of the Legislature
which enacted it, for it appears from the agreed statement of facts
than an amendment was proposed, while the act was on its passage,
striking out the words "any shad fish," in section 1, and inserting
in lieu thereof the words "any shad fish caught in the waters of the
state of South Carolina," but the said amendment was rejected, and
the court cannot do now by construction what the Legislature re-
fused to do by enactment.

In the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, the court
had under consideration certain criminal prosecutions for violations
of what is known as the "trade-mark legislation." The Congress
had passed an act of the broadest character to punish the counter-
feiting of trade-marks, which was claimed to be valid as a regulation
of commerce. Property in trade-marks had long been recognized
and protected by the common law and by the statutes of the several
states, and it was held in this case that if the power of Congress
could in any case be extended to trade-marks, as a regulation of
commerce, it must be limited to their use in "commerce with for-
eign nations, and among the several states and with the Indian
tribes," and that this legislation was not, in its terms or essential
character, a regulation that is limited, but, in its language, embraced,
and was intended to embrace, all commerce, including that be-
tween citizens of the same state. It was held that such legislation

was void for want of constitutional authority; and, in reply to the suggestion that Congress had power to regulate trade-marks used in commerce with foreign nations and among the several states, the legislation should be held valid in that class of cases, if no further, the court says:

"While it may be true that when one part of a statute is valid and constitutional, and another part is unconstitutional and void, the court may enforce the valid part, where they are distinctly separable, so that each can stand alone, it is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear, in order that crimes may be punished which are not described in language that brings them within the constitutional power of that body."

This precise point was decided in United States v. Reese, 92 U. S. 214, 23 L. Ed. 563, where the Chief Justice says:

"We are not able to reject the part which is unconstitutional and retain the remainder, because it is not possible to separate that which is constitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not there now. Each of the sections must stand as a whole, or fall together. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question then to be determined is whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only. * * * To limit the statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty."

In view of the fact that the Legislature of South Carolina refused to limit the operation of this act by rejecting the amendment above referred to, some of the concluding words in the case cited are apposite:

"If we should, in the case before us, undertake to make by judicial construction a law which Congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do, namely, make a trade-mark law which is partial in its operation, and which would complicate the rights which parties would hold in some instances under the act of Congress, and in others under state law."

Having reached the conclusion that it is the duty of this court to declare the statute invalid, under the commerce clause of the Constitution (article 1, § 8, cl. 3), as an interference with interstate commerce, it is unnecessary to consider the question raised by the complaint, and upon which an interesting argument has been presented. The complaint charges, in paragraph 6, subd. "c," that the complainants are engaged in catching and dealing in, and shipping to points outside of the state of South Carolina, the shad fish deposited and propagated by the United States as food fishes, and in the master's report it appears that this allegation is admitted to be true. It is well known that the rivers of this state had been well-nigh depleted of shad, and the Congress of the United States has undertaken by its legislation to provide for the propagation of food fishes. In sections 4395, 4396, 4397, and 4398 of the Revised Statutes [U. S. Comp. St. 1901, pp. 3001, 3002], a fish commission was appointed; and by the act of February 14, 1903, c. 552, § 4, 32 Stat. 826 [U. S. Comp. St. Supp. 1903, p. 43], this commission was put in the Department of Commerce, and by its fixed

policy and annual appropriations the United States government has undertaken to replenish the coastal waters with food fishes. By section 4398 the commissioner is authorized to take from the waters of the sea coast, where the tide ebbs and flows, such fish as may be needful and proper for the conduct of his duties, "any law, custom or usage of any state to the contrary notwithstanding"; and it appears from the reports of the fish commission that over thirty millions of shad fry have been deposited in the rivers of this state. It seems to be now pretty well agreed among those learned in the subject that the young shad hatched out in any particular river remain within a moderate distance of the mouth of that stream until the period occurs for their inland migration. It was formerly believed that shad during the winter moved towards the equator, and, wintering in the warmer waters of the South, started northward in a vast school at the beginning of the year, advancing along the coast in almost military array, sending a detachment up each successive stream, which, by a singular method of selection, sought the river in which they first saw the light; and the argument is that shad artificially propagated in rivers and in coast waters of the United states by the money of the people of the United States belong to all the people of the United States, and therefore a state has no power to impose any restriction upon such property which the United States, in furtherance of its policy of furnishing to the people food fishes, has not imposed. The argument is ingenious, and the question interesting, but the exigencies of this case do not require me to decide it, and I express no opinion upon that point.

Let a decree be prepared in accordance with this opinion.