## Court of Appeals.

December, 1904.

# THE PEOPLE v. JACOB V. BOOTMAN ET AL.

(180 N. Y. 1.)

1. FOREST, FISH AND GAME LAW—POSSESSION OF IMPORTED GAME DURING CLOSE SEASON OF 1901 NOT UNLAWFUL.

   The Forest, Fish and Game Law (L. 1900, ch. 20), which went into effect February 19, 1900, and was in force May 22 and June 2, 1901, did not make penal and criminal the possession in this State during the close season of game killed without the State and brought here during the open season; and for that reason, as decided in People v. Buffalo Fish Company, 164 N. Y. 93, a judgment dismissing a complaint in an action brought to recover penalties for alleged violations of the statute in having possession of imported game during the close season of 1901 must be affirmed.

2. CONSTITUTIONAL LAW—PROTECTION OF GAME IS WITHIN THE POLICE POWER AND THE METHOD IS WITHIN THE DISCRETION OF THE LEGISLATURE.

   The legislature in the exercise of the police power of the State has power to make the possession of imported game unlawful; laws passed for the protection of game are directly connected with the public welfare which is promoted by the preservation and injured by the destruction of so useful an article of food, free at the proper time to all the people of the State, and do not interfere with private property, for there is no property in living wild animals; and only as the law permits their capture is there property in wild animals after they are caught or killed; the method of affording protection is necessarily within the discretion of the legislature.

3. EXTRA ALLOWANCE—WHEN POWER OF COURT TO MAKE NOT AFFECTED BY STIPULATION REDUCING AMOUNT DEMANDED IN COMPLAINT.

   The power of the court to make an extra allowance in a difficult and extraordinary case is not affected by a stipulation made by the unsuccessful party two days before the trial largely reducing the amount claimed in the complaint, after the defendants had prepared for trial upon the theory that the larger amount was involved.

   People v. Bootman, 95 App. Div. 469, affirmed.

APPEAL from a judgment of the Appellate Division of the Supreme Court in the First Judicial Department, entered June

24, 1904, affirming a judgment in favor of defendant entered
upon a dismissal of the complaint by the court at a Trial Term.
Also appeal from an order of said Appellate Division affirming
an order which granted defendants an extra allowance of costs.

The nature of the action and the facts, so far as material, are
stated in the opinion.

Frank S. Black and Henderson Peck, for appellant. A
statute declaring that game shall not be possessed during a
certain season of the year and prescribing a penalty for its vio-
lation, does not deprive any person of property without due pro-
cess of law, or without just compensation therefor, in violation
of the constitution, State or federal; and this although the game
may have been taken and killed without and transported into
the State at a time when it was lawful to possess it here. (Geer
v. State, 161 U. S. 519; Lawton v. Steel, 152 U. S. 133;
Health Dept. v. Rector, etc., 145 N. Y. 32; Phelps v. Racey,
60 N. Y. 10; Game Assn. v. Durham, 19 J. & S. 306; People
v. Gerber, 92 Hun, 554; People v. Allen, 20 Misc. Rep. 120;
State v. Randolph, 1 Mo. App. 15; Haggarty v. I. M. & S.
Co., 143 Mo. 238.)   The dead bodies of any game or song birds
transported into this State and kept here on storage are subject
to the operation and effect of the laws of the State enacted in the
exercise of its police power, to the same extent and in the same
manner as though such birds had been produced in this State
and are not exempt therefrom, by reason of being introduced
into the State in the original packages or otherwise. (Phelps v.
Racey, 60 N. Y. 10; Game Assn. v. Durham, 19 J. & S. 306;
People v. Gerber, 92 Hun, 554; Whitehead v. Smith, L. R. [2
C. P. Div.] 553; State v. Randolph, 1 Mo. App. 15; State v.
Judy, 7 Mo. App. 524; State v. Farrell, 23 Mo. App. 176;
Haggerty v. I. M. & S. Co., 143 Mo. 238; Merritt v. People,
169 N. Y. 218.)   Whatever ground for difference of opinion
may have existed either as to the operation or validity of such

statutes in respect to imported game has been removed by the act of Congress, approved May 25, 1900, and known as the "Lacy Act." (Matter of Rahrer, 140 U. S. 545; Rhodes v. State of Iowa, 170 U. S. 412; Vance v. W. A. V. Co., 170 U. S. 438; Matter of Van Vliet, 43 Fed. Rep. 761; Matter of Speckler, 43 Fed. Rep. 653; Starace v. Rossi, 69 Vt. 303; State v. Bixman, 162 Mo. 1; Matter of Bergen, 115 Fed. Rep. 339.) The trial court erred in making an additional allowance of $2,000 to the respondents in this action. (Code Civ. Pro. section 3253; Duncan v. De Witt, 7 Hun, 184; Gillespy v. Bilbrough, 15 App. Div. 212.)

Louis Marshall and Julius Offenbach, for respondents.

At the time when the birds for which penalties are now sought to be recovered were brought into the State of New York and when the defendants are alleged to have been possessed of them, there was no prohibition against bringing birds caught or killed in any other State within its boundaries, or against being possessed of them. By its very terms the Forest, Fish and Game Law referred solely to birds taken or killed within the State of New York. (Suth. on Stat. Const. sections 210, 211; U. S. v. Palmer, 3 Wheat. 610; People ex rel. v. Davenport, 91 N. Y. 575; Spencer v. Myers, 150 N. Y. 269; People ex rel. v. England, 16 App. Div. 97; V. C. C. Co. v. Murtaugh, 50 N. Y. 314; Bonnell v. Griswold, 80 N. Y. 128; People v. B. F. Co., 164 N. Y. 193; Lahr v. M. E. Ry. Co., 104 N. Y. 269; Story v. N. Y. El. R. R. Co., 90 N. Y. 122.) The act of Congress, approved May 25, 1900, known as the Lacy Act, has no application to appellant's alleged cause of action, in the absence of State legislation in force at the time of its accrual, prohibiting the possession of game coming from without the State. (Cooley on Const. Lim. 574; U. S. v. De Witt, 9 Wall. 41; Patterson v. Kentucky, 97 U. S. 501, 503; C. B. Co. v. Kentucky, 154 U. S. 210; U. S. v. Boyer, 85 Fed. Rep. 434; Matter of Rahrer,

140 U. S. 545; Rhodes v. Iowa, 170 U. S. 412; Vance v. W. A. V. Co., 170 U. S. 488; Matter of Van Vliet, 43 Fed. Rep. 761; Starace v. Rossi, 69 Vt. 303; State v. Intoxicating Liquors, 25 Me. 140; State v. Bixman, 162 Mo. 1; Matter of Bergen, 115 Fed. Rep. 339.) The legislation of this State, if construed as appellant claims, including section 141 of the Forest, Fish and Game Law, is unconstitutional, so far as it tends to deprive the owner of the birds, for the possession of which penalties are sought to be recovered, of his property without due process of law. (People v. A. Booth & Co., 42 Misc. Rep. 321; Goff v. Kilts, 15 Wend. 550; Taber v. Jenny, 1 Sprague, 315; Aberdeen v. Sutter, 4 Macg. H. L. Cas. 355; Swift v. Gifford, 2 Low. 110; Ghen v. Rich, 8 Fed. Rep. 159; Young v. Hichens, L. R. [6 Q. B.] 606; Stevens v. Jeacocke, L. R. [11 Q. B.] 731; Fleet v. Hegeman, 14 Wend. 42; State v. Taylor, 27 N. J. L. 117; Amory v. Flyn, 10 Johns. 102; Manning v. Micherson, 69 Ga. 447; Haywood v. State, 41 Ark. 479; Commonwealth v. Chase, 9 Pick. 15.) The award of an extra allowance of $2,000 was warranted by the history of the case, and should not be disturbed. (Code Civ. Proc. section 1316; Raff v. K. B. & Co., 38 App. Div. 336; Bloom v. N. U. B. S. & L. Co., 81 Hun, 120; R. H. L. Co. v. Burrowes, 22 App. Div. 540; S. T. Co. v. N. Y. C. & H. R. R. R. Co., 178 N. Y. 407.)

VANN, J.: This action was brought to recover penalties to the amount of $1,168,315 for alleged violations of the Forest, Fish and Game Law in that during the close season of 1901 the defendants had in their possession 7,560 grouse; 4,835 quail; 1,776 ducks; 8,848 plover; 7,108 snipe; 8,328 snow buntings; 1,008 reed birds; 7,607 sand pipers; 788 yellow legs and 96 woodcock.

Six out of the nineteen counts of the complaint were disposed of by demurrer, which reduced the amount involved to about $325,000 (40 Misc. Rep. 27; 72 App. Div. 619; 173 N. Y. 622); and this sum was reduced by concession to about $9,960.

The facts as settled by stipulation are as follows: Between May 22nd and June 2nd, 1901, the defendants, as co-partners, had in their possession at the city and county of New York one hundred grouse, one hundred quail, ninety-six woodcock and one hundred ducks, " being of the same grouse, quail, woodcock and ducks mentioned and described in the first thirteen counts of the complaint." Said game birds were not killed in the State of New York, but in other States of the Union, where they were purchased by the defendants. They were brought into this State in the month of November, 1900, when it was lawful to possess them here and the defendants kept them on storage in the State of New York until the commencement of this action. After their purchase by the defendants outside of the State, they "were exported from States in which they were purchased to and received by them in this State by means of transportation agencies engaged in interstate commerce and in the original packages in which they were packed by the shippers thereof." It was further stipulated that they were of the fair market value of $5,000 and that the action was duly brought on the order of the chief game protector of this State.

Upon the trial said stipulation was read in evidence and both sides rested, whereupon the trial judge dismissed the complaint and the plaintiff excepted. The Appellate Division, by a divided vote, affirmed the judgment entered accordingly and the plaintiff appealed to this court.

The Forest, Fish and Game Law, as in force when it is alleged that the penalties in question were incurred, became a law on the 19th of February, 1900. (L. 1900, ch. 20, General Laws, ch. 31.) It is to some extent a revision but chiefly a re-enactment of the Game Law of 1892 and the Fisheries, Game and Forest Law of 1895, as amended at various times. (L. 1892, ch. 488; L. 1895, ch. 395.) So far as the questions presented by this appeal are concerned, it is the same in substance as the acts considered by the court in People v. Buffalo Fish Company

(164 N. Y. 93, 15 N. Y. Crim. 93), where it was held that the Fisheries, Game and Forest Law, as amended, applied only to such fish as were taken from the waters of this State, and not to those imported from a foreign country. This conclusion was based upon the ground that the legislature did not intend by the general language used in a statute so highly penal in character to include fish caught outside of the State. While three judges dissented from that conclusion and three others who sit in this case but did not sit in that, might also have reached a different conclusion had the subject been before them for judicial action, we all feel bound by the rule of *stare decisis* to recognize that decision as settling the meaning of the act then under consideration so far as it was involved in the question at that time before the court. As the language used in that act in relation to fish does not differ in substance from the language used in the act now before us in relation to game, we are required by the same rule to hold that the legislature in enacting the Forest, Fish and Game Law, as it stood when the defendants are alleged to have violated it, did not intend to make penal and criminal the possession, in this State during the close season, of game killed without the State and brought here during the open season.

It is claimed, however, that the passage by Congress of a statute known as the " Lacy Act," removed an obstacle which had previously prevented the application of our game laws to the possession of imported game, and that the operation and effect thereof were expanded accordingly. That act provides in substance that foreign game when transported into any State shall be subject to the laws of that State, enacted in the exercise of its police powers, to the same extent as if such game had been produced in such state, and shall not be exempt therefrom by reason of importation in original packages. (31 U. S. Stat. at Large, ch. 553.) It became a law by the approval of the president on the 25th of May, 1900, nearly three months after the passage of the Forest, Fish and Game Law. If the Federal

statute had been passed first it would not be unreasonable to believe that the legislature intended to so expand the meaning of our game laws as to forbid the possession of imported game during the close season. It was not passed, however, until after the enactment of the State law, and hence can have no effect upon its meaning as declared by this court in the Buffalo Fish Co. case. The defendants had a right to act on that decision as a correct interpretation of the statute and to purchase and possess the game in question at the time and in the manner admitted by the stipulation. A statute which not only imposes heavy penalties but also makes a violation thereof a misdemeanor should not receive a forced construction but should be construed strictly as required by the general rule governing the subject.

While the legislature did not act in time to affect this action, it has since removed all doubt as to its present intention and has thrown some light on its previous intention, by so amending the Forest, Fish and Game Law as to provide that "wherever in this act the possession of fish or game, or the flesh of any animal, bird or fish, is prohibited, reference is had equally to such fish, game or flesh coming from without the State as to that taken within the State." (L. 1902, ch. 194.) That amendment when read in connection with the Lacy Act and the decisions of the Federal courts, removes from the region of discussion the questions considered in the Buffalo Fish Co. case in relation to the application of the Forest, Fish and Game Law to imported game, which was decided, and the effect of the commerce clause of the Federal Constitution, which, although discussed, was not decided. (Matter of Rahrer, 140 U. S. 545; Vance v. Vandercook Co., 170 U. S. 438.)

It was held by a majority of the learned justices of the Appellate Division that the legislature has no power to make the possession of imported game unlawful, as it would violate the provisions of our State Constitution relating to the protection of property. We do not assent to this proposition. For time out

of mind and in all jurisdictions, laws passed for the protection of fish and game have been regarded as sanctioned by the police power which belongs to every sovereign State. The game and the fish within the boundaries of the State belong to the people in their unorganized capacity and may be taken by any citizen without fee or license at any time during the open season. It is to the interest of the State that neither should be wasted or destroyed and that both should be carefully protected, especially during the breeding season. Without protection the fish and game will soon disappear and the people thus be deprived of an important source of food supply, as well as a delightful recreation which promotes health and prolongs life. The protection of game falls within the legitimate exercise of the police power, because it is directly connected with the public welfare, which is promoted by the preservation and injured by the destruction of so useful an article of food, free at the proper time to all the people of the State. Laws passed for this purpose do not interfere with private property, for there is no property in living wild animals and only as the law permits their capture is there property in wild animals after they are caught or killed.

It was lately declared by the Supreme Court of the United States, when affirming a judgment of this court, that "the preservation of game and fish has always been treated as within the proper domain of the police power, and limiting the season within which birds and wild animals may be killed or exposed for sale, and prescribing the time and manner in which fish may be caught, have been repeatedly upheld by the courts. . . . The taking and selling of certain kinds of fish and game at certain seasons of the year tend to the destruction of the privilege or right by the destruction consequent upon the unrestrained exercise of this right. This is regarded as injurious to the community, and, therefore, it is within the authority of the legislature to impose restriction and limitation upon the time and manner of taking fish and game, considered valuable as articles of

food or merchandise. For this purpose fish and game laws are enacted. The power to enact such laws has long been exercised, and so beneficially for the public that it ought not now to be called into question." (Lawton v. Steele, 119 N. Y. 226, 152 U. S. 133, 138; citing State v. Roberts, 59 N. H. 256; Commonwealth v. Chapin, 5 Pick. 199; McCready v. Virginia, 94 U. S. 391; Vinton v. Welch, 9 Pick. 87, 92; Commonwealth v. Essex Co., 13 Gray, 239, 248; Phelps v. Racey, 60 N. Y. 10; Holyoke Co. v. Lyman, 15 Wall. 500; Gentile v. State, 29 Ind. 409; State v. Lewis, 33 N. E. Rep. 1024.)

In a more recent case it was said by that high court: "From the earliest traditions the right to reduce animals *ferae naturae* to possession has been subject to the control of the law-giving power. . . . In most of the States laws have been passed for the protection and preservation of game. We have been referred to no case where the power to so legislate has been questioned, although the books contain cases involving controversies as to the meaning of some of the statutes. . . . The adjudicated cases recognizing the right of the States to control and regulate the common property in game are numerous. . . . ' The wild game within a State belongs to the people in their collective sovereign capacity. It is not the subject of private ownership except in so far as the people may elect to make it so, and they may, if they see fit, absolutely prohibit the taking of it, or traffic or commerce in it, if it is deemed necessary for the protection or preservation of the public good.' . . . The right to preserve game flows from an undoubted existence in the State of a police power to that end, which may be none the less efficiently called into play, because, by doing so, interstate commerce may be remotely and indirectly affected. Indeed, the source of the police power as to game birds flows from the duty of the State to preserve for its people a valuable food supply." (Geer v. Connecticut, 161 U. S. 519.)

The right to pass laws for the protection of game being conceded, as in view of the authorities it must be, the method of

affording protection is necessarily within the discretion of the legislature. It may provide a close. season for the taking of game, and may prohibit the possession or sale of game during that season. It may close the game market throughout the State during the period of prohibition, in order to remove temptation from poachers and pot-hunters, who are not apt to run the risk of taking game out of season if they cannot sell it. To do this effectively it may be necessary to close the market as to game taken without the State, as well as within, for there are no marks by which birds killed in Michigan can be distinguished from those killed in New York. When enacting a game law the legislature may provide for its ready enforcement, not simply by making the possession of game during the close season presumptive evidence of a violation of the statute, but it may go farther and, in order to prevent evasion, fraud and perjury, may prohibit the possession of game in this State during the close season, even if it was taken in another State and brought here during the open season. The action of Congress has taken away all questions of interstate commerce, so that the State can act with entire freedom and can prevent the shipment of game into or out of its own territory; and if game is imported, it can regulate or prohibit the sale thereof. Such provisions are warranted by the police power, and are not in conflict with either the State or Federal Constitutions. This appears from the authorities already cited, to which we add the following: Smith v. Maryland (59 U. S. 71); State v. Randolph (1 Mo. App. 15); Haggerty v. I. M. & S. Co. (143 Mo. 238); Roth v. State (51 Ohio St. 209); Wagner v. State (97 Ill. 320); Ex parte Maier (113 Cal. 476); Smith v. State (155 Ind. 611); State v. Rodman (58 Minn. 293); Commonwealth v. Savage (155 Mass. 393); Organ v. State (56 Ar. 270); Allen v. Wyckoff (48 N. J. Law, 90, 93); People v. Gerber (92 Hun, 554, S. C. 11 N. Y. Crim. 142); Association for protection of Game v. Durham (19 J. & S. 306).

While it is our duty to affirm the judgment of the Appellate Division, we have felt constrained to consider the constitutional question discussed by that learned court, lest the conclusion announced should be regarded as a precedent and result in evil. We do not affirm because, as held below, the statute would be unconstitutional, if construed according to the claim of the plaintiff, but because it should be construed in accordance with our prior decision.

The order granting an additional allowance of $2,000 should also be affirmed, because the court had power to make it, inasmuch as the action was difficult, owing to the number of statutes to be construed and authorities to be examined, and extraordinary, as it originally involved over one million dollars and required unusual care in preparing for trial. While the demurrers reduced the amount claimed to about $325,000, the stipulation making the final reduction is dated but two days before the trial began. An extra allowance is made to reimburse the successful party in a difficult and extraordinary case for the expense of the litigation, which depends to some extent upon the amount claimed. The plaintiffs could not allow the defendants to prepare for trial on the theory that a large sum was involved and then subvert the power of the court to make an allowance accordingly by stipulating to reduce their demand, after substantially all the preparation had been made. If this could be done two days before the trial, we do not see why it could not be done after the trial had commenced and the entire preparation made. As the power to make the allowance existed, the amount thereof, subject to the limitation of the statute which was not exceeded, was within the discretion of the courts below, and beyond our power to review.

The judgment and order should be affirmed, with costs.

CULLEN, Ch. J., GRAY, O'BRIEN, BARTLETT, HAIGHT and WERNER, JJ., concur.

Judgment and order affirmed.