(109 App. Div. 295.)·

PEOPLE ex rel. SILZ v. HESTERBERG, Sheriff.

(Supreme Court, Appellate Division, Second Department.   November 29, 1905.)

1. GAME—CONSTITUTIONALITY OF STATUTES—INTERFERENCE WITH COMMERCE.
Forest, Fish, and Game Law, Laws 1900, p. 43, c. 20, §§ 106, 108, as amended by Laws 1904, p. 1413, c. 588, define the closed season for grouse and plover.   Section 119, c. 20, p. 44, Laws 1900, prescribes penalties for a violation of the law.   Section 141 added by Laws 1902, p. 487, c. 194, provides that, whenever the possession of fish or game is prohibited, reference is equally had to fish or game coming from without the state as to that taken within the state.   Held, that the law, in so far as it attempts to punish as a crime the possession of plover and grouse lawfully imported into the state from foreign countries under the federal customs statutes, which plover and grouse are readily distinguishable from native varieties and are wholesome articles of food, and recognized and staple articles of commerce, is an unconstitutional interference with foreign commerce.

2. SAME—FEDERAL STATUTES—CONSTRUCTION.
31 Stat. 187, c. 553 [U. S. Comp. St. 1901, p. 3181], providing that all dead bodies of foreign game animals, the importation of which is prohibited, or the dead bodies of wild game animals transported into any state or territory, shall, upon arrival in such state or territory, be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, relates to the transportation of game from one state to another, and has no application to the importation of game, which is not prohibited and which constitutes a conceded article of commerce, from a foreign country.

Miller and Jenks, JJ., dissenting.

Appeal from Special Term, Kings County.

Habeas corpus proceedings by the people, on the relation of August Silz, against Henry Hesterberg, sheriff of Kings county.   From an order quashing the writ, relator appeals.   Reversed.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, RICH, and MILLER, JJ.

Edward Lauterbach (Edward R. Finch and John Burlinson Coleman, on the brief), for appellant.

Julius M. Mayer, Atty. Gen. (Alexander T. Mason, Dep. Atty. Gen., on the brief),·for respondent.

WOODWARD, J.   There is no dispute about the facts in this case. One August Silz, on the 30th day of March, 1905, had in his possession in the county of Kings one imported golden plover, which was lawfully taken, killed, and captured in England during the open season for such game there, and thereafter sold and consigned to Silz in New York City by a dealer in game in London, England, and at the same time he had in his possession one imported black cock, a bird lawfully taken and killed in Russia and consigned to the said Silz by the same London dealer.   These birds it is conceded were duly imported by Silz in accordance with the provisions of the tariff laws and regulations in force, through the custom house in New York City, during the open season for plover and grouse in the state of New York.   It is admitted that these particular birds are entirely different varieties of game birds

from the game birds known as "plover" and "grouse" in the state of New York, and from any bird native to the state of New York, or to America; that they are different in form, size, color, and markings from the game birds known as "plover" and "grouse" in the state of New York, and from any American bird, and can be easily and readily distinguished from such plover and grouse found in New York state, and from any bird native to America, both with their feathers on and after they are plucked. It is likewise conceded that such birds were and are staple, sound, wholesome, and valuable articles of food, and are in constant use as such, and that they are recognized and staple articles of commerce between the different countries of Europe and the United States of America, and were of the fair market value of $1.50, and the only question presented upon this appeal is whether the possession of these birds, under these circumstances, constituted a crime under the provisions of sections 106, 108, 119, and 141 of the forest, fish, and game law (Laws 1900, pp. 43, 44, 48, c. 20), as amended by chapter 588, p. 1413, of the Laws of 1904.

In principle the exact question here presented was before the court in People v. Buffalo Fish Co., 30 Misc. Rep. 130, 62 N. Y. Supp. 543, and Mr. Justice Lambert, after reviewing the authorities, said:

"The principle laid down by the case referred to clearly establishes the right of the defendant to import the fish in question into the state of New York as a purchaser and importer, and in the exercise of such right, conferred by the federal government, it was not within the power of the Legislature to make the possession of the property thus imported unlawful. Possession is a necessary incident to the right of importation and to the right of property imported. Possession and the right of sale is the intended consequence of the right of importation. It would as effectually destroy the privilege of importation to make the intended consequence thereof unlawful as to prohibit importation itself. Applying the rules laid down in the cases discussed to the admitted facts, that the fish in question were imported from the Dominion of Canada and a duty had been paid for such privilege under the Dingley act, some of which were in the hands of the importer for shipment and the remainder in its possession for the purposes of sale, it is clear that the statute of this state making such possession unlawful is in conflict with the general power of Congress to regulate commerce between foreign nations and the several states, and to the extent that it attempts to levy tribute upon the custodians of these fish, whether by means of taxation or a penalty for having them in possession, it is null and void."

Continuing a review of authorities, the same learned jurist sums up as follows:

"This being the law of the land, that the importer acquires a right, not only to bring the articles into the country, but to mix them with the common mass of property, the fish imported by this defendant became by reason of such importation absolute property in the hands of the importer, as well as all who might take title under him, and it is an abuse of the police power which cannot be justified by any sound process of reasoning to say that the Legislature may make it a crime, and subject the owner of this lawfully acquired property to penalties for merely having the property in his possession. It is conceded, of course, that if these fish were diseased, or had remained exposed to the elements until they were unfit for food and constituted a menace to the public health, the state would have the right to interpose its police powers and prevent the sale."

This case was considered by the Appellate Division in the Fourth Department, where it was affirmed on the opinion of the court below, (45 App. Div. 631, 62 N. Y. Supp. 1143), and was then taken to the Court of Appeals, where it was affirmed by a divided court, O'Brien, J.,

writing.    After a careful review of the questions submitted, the learned court said:

"Admitting, for the purposes of the argument, that the statute in question means just what the plaintiff's counsel claims for it, the important fact still remains that Congress has permitted the defendant to import fresh fish upon payment of certain duties. It has paid the duties and complied with the federal regulations, but when the article is brought here the state steps in and forbids the defendant to have it in its possession, and, of course, forbids the sale. This creates a direct conflict between the regulations of Congress and those of the state, and consequently the latter must yield to the former. The state had no power to extend its police legislation to such a transaction, and, of course, had no power to forbid what Congress had expressly permitted."

It appears to be conceded upon this appeal that People v. Buffalo Fish Co., supra, would be controlling, were it not for certain statutory provisions which have been enacted since the decision in that case, and it is contended that the Court of Appeals, in People v. Bootman, 180 N. Y. 1, 72 N. E. 505, has finally determined the question here presented in favor of the respondent. As we read that case, however, it does not appear to question the law of the Buffalo Fish Company Case, in so far as it decided that fish brought into this country from foreign lands under the provisions of the customs laws could be possessed and sold without regard to state statutes. In fact, the decision follows the Buffolo Fish Company Case, and holds that game birds, grouse, quail, etc., which were not killed in the state of New York, but which were killed in sister states and transported into this state in November, 1900, and which were in the possession of the defendants in June, 1901, were not unlawfully possessed, and that the owners were not, therefore, subject to the penalties attempted to be imposed. After determining the only question then before the court, the learned jurist writing went into a discussion of what the law might be under certain statutory provisions since enacted, and it was pointed out that:

"It was held by a majority of the learned justices of the Appellate Division that the Legislature has no power to make the possession of imported game unlawful, as it would violate the provisions of our state Constitution relating to the protection of property."

And it was this determination of the Appellate Division in the First Department (95 App. Div. 469, 88 N. Y. Supp. 887) which the court disapproved, and not the decision of Mr. Justice Lambert and the Appellate Division in the Fourth Department that the act was unconstitutional and void, as interfering with the commerce clause of the federal Constitution, in so far as it attempted to deal with articles imported under the provisions of the customs laws of the nation. "While it is our duty," say the court in the Bootman Case, supra, "to affirm the judgment of the Appellate Division, we have felt constrained to consider the constitutional question discussed by that learned court, lest the conclusion announced should be regarded as a precedent and result in evil."

The legislation under which it is claimed the police powers of the state have been enlarged so as to make it a crime for a man who has lawfully possessed himself of property, having all of the attributes of property outside of this state, and in no wise a menace to the morals or health of the community, to bring it into his possession within this jurisdiction, is found in 31 Stat. 187, c. 553 [U. S. Comp. St. 1901, p. 3181],

and in section 141 of the forest, fish, and game law, as amended by chapter 194, p. 487, of the Laws of 1902. The federal statute provides in section 5 (31 Stat. 188 [U. S. Comp. St. 1901, p. 3182]) that:

"All dead bodies, or parts thereof, of any foreign game animals, or game or song birds, the importation of which is prohibited, or the dead bodies, or parts thereof, of any wild game animals, or game or song birds transported into any state or territory, or remaining therein for use, consumption, sale, or storage therein, shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such animals or birds had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

The state statute appears to have been designed to be in harmony with this provision of the federal statute, for it is provided that:

"Whenever in this act the possession of fish or game, or the flesh of any animal, bird or fish, is prohibited, reference is had equally to such fish, game or flesh coming from without the state as to that taken within the state."

But what has either of these provisions to do with the conceded facts in the case now before us? Without going into an analysis of the statutes, it is plain that, in so far as the federal statute has any bearing whatever, it must relate to interstate and not to foreign commerce, and we are dealing with a conceded article of foreign commerce, with an article the importation of which is not prohibited. Articles which may be imported under the customs laws and regulations of the United States are within the exclusive jurisdiction of Congress, and it has not attempted, in the so-called "Lacy Act," to place them under the police regulations of the states. All game animals or birds, "the importation of which is prohibited" by the customs laws or regulations of the United States, are placed upon the same footing as "the dead bodies or parts thereof of any wild animals, or game or song birds, transported into any state or territory," the word "transported" being used in the sense of shipped from one state to another; but this by necessary implication excludes from state control those game birds, etc., the importation of which is not prohibited. As to these, Congress has provided for their importation, and, as O'Brien, J., so well said in People v. Buffalo Fish Co., supra:

"The state had no power to extend its police legislation to such a transaction, and, of course, had no power to forbid what Congress had expressly permitted."

Whatever may be our opinion as to the question discussed outside of the scope of the decision made in the Bootman Case, supra, it certainly does not overrule the Buffalo Fish Company Case, supra, in so far as that case held that fish imported under the tariff laws and regulations of the United States were not subject to state control, except as they might become so by reason of some inherent vice in the fish themselves; and as the case now before us cannot be distinguished in principle from the latter, it follows that there should be a reversal of the order appealed from.

Order appealed from reversed, and petitioner discharged.

HIRSCHBERG, P. J., and RICH, J., concur.

MILLER, J.   I dissent.   Evidently the imprisonment which is the
subject of inquiry in this proceeding was procured for the purpose of
enabling the petitioner to present the legal questions involved upon his
own statement of facts, and it is urged that the allegation in the com-
plaint that the plover and grouse in question "can be easily and readily
distinguished from such plover and grouse found in the state of New
York, and from any American bird, both with their feathers on and
after they are plucked, and after they are cooked and ready for the
table," prevents the application of section 141 of the forest, fish, and
game law, added by chapter 194, p. 487, of the Laws of 1902, which,
so far as material, provides:

"Whenever in this act the possession of fish, or game, or the flesh of any ani-
mal, bird or fish, is prohibited, reference is had equally to such fish, game or
flesh coming from without the state as to that taken within the state."

And the contention is that said section applies only to fish and game
identical in form, shape, size, color, and markings to the fish and game
found in this state.   By section 28 of the forest, fish, and game law
(chapter 20, p. 27, Laws of 1900, as amended by chapter 317, p. 880,
Laws of 1902) the sale or possession of "grouse" during the closed sea-
son is prohibited; by section 30 of said law, as amended by chapter 588,
p. 1414, Laws of 1904, the possession of plover from January 1st to
August 15th is prohibited; and by section 140 of said law "grouse" is
defined as including "ruffed grouse, partridge and every member of
the grouse family."   In effect, therefore, and practically in express
terms, the Legislature has prohibited during the times stated the posses-
sion of plover and of every member of the grouse family, whether taken
within the state or coming from without the state.   It is difficult to
see how the legislative intent could have been more clearly expressed,
for surely it is not necessary for the Legislature to say expressly that
it intends to mean just what it says.

But the argument is made that, because said section 141 was added
after the decision in People v. Buffalo Fish Co., 164 N. Y. 93, 58 N. E.
34, 52 L. R. A. 803, 79 Am. St. Rep. 622, which construed the act of
1900 as applying only to fish and game taken within the state, the word
"such" in said section 141 should be construed as referring only to fish
and game identical in size, etc., to that found in the state.   The argu-
ment is ingenious, rather than convincing.   It is perfectly apparent that
the amendment of 1902 was declaratory of its previous intention, which
the Legislature thought the Court of Appeals had misconceived, and
in expressing that intention it must be supposed as intending to mean
just what it said.   It is matter of common knowledge that it is well
nigh impossible to secure even a practical enforcement of laws like
the one in question; and although it is said that the closing of our mar-
kets to game that can be distinguished from our own does not aid in
the protection of our game, I can conceive, even assuming that "black
cock" and "golden plover" can be distinguished from our own birds
"when cooked," that a very small number of "black cock" and "gold-
en plover" might suffice to supply a very large demand for game in the
New York markets.   It is not our province to determine what meas-
ures should be adopted to secure an enforcement of the law, and the

fact that we might regard the measures adopted by the Legislature as unnecessary or as too harsh furnishes no reason for construing a statute, that does not admit of construction, as we think the Legislature ought to have enacted it. It is our duty rather to give effect to the expressed intention of the Legislature unless it contravenes some organic law. The constitutional questions presented were fully considered by the Court of Appeals in People v. Bootman, 180 N. Y. 1, 72 N. E. 505. Judge Vann, speaking for every member of the court, said:

"That act [referring to the so-called "Lacy Act," 31 Stat. 187, c. 553 (U. S. Comp. St. 1901, p. 3181)] provides in substance that foreign game when transported into any state shall be subject to the laws of that state, enacted in the exercise of its police powers, to the same extent as if such game had been produced in such state, and shall not be exempt therefrom by reason of importation in original packages. * * * That amendment [referring to Laws 1902, p. 487, c. 194], when read in connection with the Lacy act and the decisions of the federal courts, removes from the region of discussion the questions considered in the Buffalo Fish Co. Case in relation to the application of the forest, fish, and game law to imported game, which was decided, *and the effect of the commerce clause of the federal Constitution, which, although discussed, was not decided.*. [Italics are my own.] * * * The action of Congress has taken away all questions of interstate commerce, so that the state can act with entire freedom and can prevent the shipment of game into or out of its own territory; *and, if game is imported, it can regulate or prohibit the sale therof.* [Italics are my own.] Such provisions are warranted by the police power, and are not in conflict with either the state or federal Constitution."

True, this discussion was not necessary to the decision, as the court stated; but grave doubts on the constitutional questions had been created by the discussion in the Buffalo Fish Co. Case and by the decision of the Appellate Division in the Bootman Case. To set these doubts at rest, and because of the public importance of the question, the Court of Appeals stated its views, and it cannot be assumed that this was done without a full and careful consideration of the subject. It seems to me, therefore, that further discussion in this court is purely academic, and I should rest my vote on the authority of the Bootman Case without further discussion, were it not for the earnestness and ability with which counsel attempted to distinguish that case, and for the fact that we are not agreed on the question.

In the first place it is said that the Buffalo Fish Co. Case was not overruled by the Bootman Case, but that it is still authority for the proposition that the statute offends both the state and federal Constitutions. The answer is that it never was authority for any such proposition, and this without regard to the effect of the Lacy act. Three judges only assented to that proposition, three united in a vigorous and logical defense of the constitutionality of the act, and the concurrence of the seventh with the opinion of the majority was expressly limited to the point that the act was not applicable, thereby, by implication at least, agreeing with the minority on the constitutional question; and while the decision in the Bootman Case upon the meaning of the act was controlled by the Buffalo Fish Co. Case, the court expressly stated that its decision was governed by the rule of stare decisis.

Next it is claimed that the peculiar wording of section 5 of the Lacy act (31 Stat. 188 [U. S. Comp. St. 1901, p. 3182]) presents a question not considered in the Bootman Case, and that therefore the admitted

facts of this case present a new question for consideration. Said section 5 is as follows:

"Sec. 5. That all dead bodies or parts thereof, of any foreign game animals, or game or song birds, the importation of which is prohibited, or the dead bodies, or parts thereof, of any wild game animals, or game or song birds transported into any state or territory, or remaining therein for use, consumption, sale, or · storage therein, shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such animals and birds had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise. This act shall not prevent the importation, transportation, or sale of birds or bird plumage manufactured from the feathers of barnyard fowl."

The argument is that the express reference to "foreign game animals, or game or song birds, the importation of which is prohibited," by necessary implication excludes from the effect of the statute all foreign game animals or birds the importation of which is not prohibited, and that although the words "any wild game animals, or game or song birds," subsequently used in the section, are comprehensive enough to include foreign game animals or birds, the meaning of these words is restricted by the word "transported," which means "shipped" from one state to another, and does not include an import. Reading the section without reference to its context, there seems to be much force in the first part of this argument; for it would seem that the foreign game animals or birds referred to were those the importation of which was prohibited by the act, and that, by expressly including them, all others were excluded. The importation of certain living animals and birds is prohibited by section 2 of the act, as follows:

"The importation of the mongoose, the so-called 'flying foxes' or friar bats, the English sparrow, the starling, or such other birds or animals as the Secretary of Agriculture may from time to time declare injurious to the interest of agriculture or horticulture, is hereby prohibited."

It may be that the words "the importation of which is prohibited," in section 5, should be interpreted as though the phrase read "the importation of which, if living, is prohibited by section 2"; and, assuming this to be the correct construction of this phrase, the question is presented whether it limits the subsequent general expression so as to exclude therefrom all foreign wild game animals and birds the importation of which is not thus prohibited. Certainly the expression "any wild game animals, or game or song birds," includes foreign animals and birds, and there is no force in the argument based on the use of the word "transported," because that is not a correlative of the word "importation." It relates alike to the phrase "all dead bodies or parts thereof, of any foreign game animals," etc., and to the phrase "all dead bodies, or parts thereof, of any wild game animals," etc., and obviously means "carried," which is comprehensive enough to include both an import and a shipment from one state to another. The office of construction is to determine the legislative intent, and, when such intent is apparent, canons of construction, adopted solely to determine what it is, must yield to it. Congress declared in the first section of the act that its purpose was to aid in the preservation, distribution, introduc-

tion, and restoration of game and other wild birds, and the manner in which it effected this purpose was by supplementing state laws to the extent of removing any question as to their conflict with the commerce clause of the federal Constitution.   It evidently deemed the act an appropriate one by which to prohibit the importation of animals and birds deemed to be injurious to agriculture and horticulture.   Our attention is not called to any other federal statute prohibiting the importation of game animals or birds, and, if the application of section 5 is to be limited to the foreign animals and birds the importation of which is prohibited by the act, we shall have difficulty in determining what harm the Congress thought dead mongoose, bats, sparrows, and starling might inflict upon agriculture or horticulture, or exactly what aid in the enforcement of local laws would result from making their "dead bodies or parts thereof" subject to the operation and effect of said laws. The construction contended for would entirely defeat the declared purpose of the act.   Obviously the sole purpose of making game taken without the state subject to the laws of the state is to prevent the sale of game taken within the state under the guise of game taken from without, and, if foreign game can be utilized for the purpose, it would be senseless, as well as useless, to prohibit game from other states.   As the expression "any wild game animals, or game or song birds transported into any state or territory," includes foreign game, and as that construction gives effect to the declared purpose of the act, while any other defeats such purpose, such construction should be adopted, whatever other parts of the act may be thought to mean.

But even if this statute, passed to accomplish a very beneficial purpose, can be so emasculated as to defeat such purpose, I should still vote to affirm this order upon the reasoning of Judge Gray in the Buffalo Fish Co. Case, and of Judge Vann in the Bootman Case.   One question must certainly be deemed removed from the realm of controversy, viz., that the enactment of laws for the preservation of game is a legitimate exercise of the police power of the states.   Geer v. State of Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793; Phelps v. Racey, 60 N. Y. 10, 19 Am. Rep. 140; Lawton v. Steele, 119 N. Y. 226, 23 N. E. 878, 7 L. R. A. 134, 16 Am. St. Rep. 813; Id., 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; Commonwealth v. Savage, 155 Mass. 278, 29 N. E. 468; Roth v. State, 51 Ohio St. 210, 37 N. E. 259, 46 Am. St. Rep. 566; Magner v. People, 97 Ill. 320; Merritt v. People (Ill.) 48 N. E. 325; Stevens v. People, 89 Md. 669, 43 Atl. 929; State v. Randolph, 1 Mo. App. 15; State v. Judy, 7 Mo. App. 524; State v. Farrell, 23 Mo. App. 176; Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129; State v. Schuman (Or.) 58 Pac. 661, 47 L. R. A. 153, 78 Am. St. Rep. 754.   All of the cases cited supra, except Geer v. State of Connecticut and Lawton v. Steele, upheld the validity of statutes whose prohibition extended alike to game taken without as well as within the state in which the statute was enacted.   Having settled the question that the subject is a proper one for the exercise of the police power, the conclusion would seem to be inevitable that the necessity for the exercise of such power and the means of making such exercise effective are solely for the Legislature, and that in selecting means legitimately tending to accomplish its purpose the Legislature

does not offend either the state or federal Constitution. No one disputes the right of the state to legislate respecting purely internal affairs, and so far as the commerce clause of the federal Constitution is concerned this right does not rest upon the police power. It is only when the legislation affects interstate or foreign commerce that it must be sustained, if at all, by resort to the police power reserved to the states. No one disputes that the individual holds his property subject to the legitimate exercise of the police power, and in this case it may be added that the petitioner acquired the property with the knowledge, with which he was at least chargeable, of the circumstances under which he could possess it. Concededly the subject of this legislation was a proper one for the exercise of the police power, the means adopted certainly tend to accomplish the object in view, and we cannot say that the object of the statute has been lost sight of, or that the act in its essentials is anything but an act passed in the exercise of the police power to preserve the game of the state; and the fact that commerce may be remotely affected or that the dominion of an individual· over his property may be controlled does not bring the act within the prohibition of either the state of federal Constitution, unless, while asserting the power, we are to deny the right to exercise it effectively.

As I understand the decisions respecting the commerce clause of the Constitution, the inquiry in each case is whether the particular act is essentially a regulation of commerce, or a legitimate exercise of the police power. If the former, merely calling it an act passed in the exercise of the police power does not save it from the prohibition of the Constitution; if the latter, the mere fact that commerce may be affected does not make the act a regulation of commerce within the meaning of the Constitution. The line of demarkation between the power of the state and the prohibition of the Constitution is of necessity so indefinite that the court must determine in respect to each case as it arises on which side of the line it falls, and there certainly is no case in the Supreme Court of the United States so nearly in point as Geer v. State of Connecticut, supra. The statute there passed upon prohibited the possession for the purpose of transportation beyond the state of Connecticut of birds lawfully killed within the state. The plaintiff in error had become the possessor of the birds in question after they had become an article of commerce. It is true, as pointed out by Judge O'Brien in the Buffalo Fish Co. Case, that one of the grounds of the decision of the Supreme Court was that wild game belonged to the people in common, and that therefore the state could qualify the ownership by any person reducing such game to possession; but it is equally true that the court placed its decision upon the distinct ground of the undoubted right of the state in the exercise of its police power to pass laws for the preservation of game, even though interstate commerce was remotely affected, and Mr. Justice White, speaking for a majority of the court, prefaced the discussion of this question with the following statement:

"Aside from the authority of the state, derived from the common ownership of game and the trust for the benefit of its people which the state exercises in relation thereto, there is another view of the power of the state in regard to the property in game, which is equally conclusive."

And in discussing the question he said:

"The exercise by the state of such power therefore comes directly within the principle of Plumley v. Massachusetts, 155 U. S. 461, 473, 15 Sup. Ct. 154, 39 L. Ed. 223 [which was a case involving a sale in the original package of oleomargarine colored in imitation of butter, in violation of a statute of the state of Massachusetts]."

In the Geer Case the statute in terms prohibited interstate commerce in game lawfully reduced to possession in the state of Connecticut. The statute in question does not in terms or effect prohibit interstate or foreign commerce. So far as the facts in the case at bar are concerned, the importation of the birds by the petitioner was perfectly lawful, and his possession of them would have continued lawful, had he observed the statute by giving the bond required.

It is claimed that this case is controlled by Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128, and that Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223, is not applicable. Even then the facts of this case do not bring it within the prohibition of the commerce clause, for the reason that there is no question here of possession in the original package. On the contrary, it must be assumed that these birds had become part of the mass of the property of the state, subject to the laws passed by the state in the conduct of its purely internal affairs, because, if the petitioner relies upon any exception to save him from the operation of the statute, even assuming that there be such an exception, that is a matter of defense, which need not have been negatived in the complaint, and Leisy v. Hardin, supra, goes no further than to hold that it was not competent in that particular case for the state to prohibit the sale in the original package, and such was the case of Schollenberger v. Pennsylvania, 171 U. S. 4, 18 Sup. Ct. 757, 43 L. Ed. 49, construing an act which was essentially a regulation of commerce.

It is said the right to import carries with it the right to sell, and the right to purchase of the importer must carry a like right to sell, and so on ad infinitum, whatever form the property may assume, and by whomsoever it may become possessed. Obviously there must come a time when the property introduced into the state becomes so mingled with the mass of property of the state as to be subject to laws passed either for taxation or in the regulation of its purely internal affairs. The line must be drawn somewhere and somewhat arbitrarily, and as drawn by the Supreme Court of the United States it is where the article loses its distinctive character as an import or as an article of interstate commerce, to wit, when it ceases to retain the form in which it was transported into the state, when the original package is broken. Brown v. State of Maryland, 12 Wheat. 419, 6 L. Ed. 678, and cases cited supra.

I vote to affirm the order.

JENKS, J., concurs.