(152 App. Div. 614.)

PEOPLE v. GUITON et al.

(Supreme Court, Appellate Division, Third Department. September 27, 1912.)

1. FOOD (§ 1*)—OLEOMARGARINE—POWER TO REGULATE SALE.

The state can prevent sale of oleomargarine as butter, but not as oleomargarine.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 1.*]

2. FOOD (§§ 1, 8*)—OLEOMARGARINE—SALE—STATUTORY REGULATION.

Agricultural Law (Consol. Laws 1909, c. 1) § 38, which prohibits manufacture of oleomargarine in imitation or resemblance of natural butter, is a valid police regulation, and prohibits a manufacturer from selecting ingredients in such manner as to designedly make his product a closer imitation of natural butter.

[Ed. Note.—For other cases, see Food, Cent. Dig. §§ 1, 7, 8; Dec. Dig. §§ 1, 8.*]

Smith, P. J., and Houghton, J., dissenting.

Appeal from Trial Term, Albany County.

Action by the People of the State of New York against John J. Guiton and another. Judgment dismissing the complaint (73 Misc. Rep. 408, 133 N. Y. Supp. 353), and the People appeal. Reversed, and new trial granted.

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, BETTS, and LYON, JJ.

Thomas Carmody, Atty. Gen., for the People.

Breed, Abbott & Morgan, of New York City (William C. Breed and Dana T. Ackerly, both of New York City, of counsel), for respondents.

JOHN M. KELLOGG, J. Oleomargarine is composed of approximately 50 per cent. of oleo oil derived from beef fat, 10 to 20 per cent. of neutral oil pressed from hog fat, and 10 to almost 20 per cent. of cotton seed oil. The other constituents are cream or butter and salt, of which there would be, depending upon the per-

centages of the neutral and cotton seed oils used, from 10 to 30 per cent. The other constituents are churned with the cream or butter, and the finished product is commercial oleomargarine, which, chemically considered, is the equivalent in all respects of butter, with a little larger percentage of butter fats.

[1] Oleomargarine has been a subject of frequent litigation, and it is unnecessary and unprofitable to attempt to summarize the various decisions. It may be considered as established that the mere fact that it is a good substitute for butter and is used in place of it forms no legal objection to its manufacture or sale. Every one who desires to purchase oleomargarine, as such, has the right to purchase it, and the state cannot interfere with its being put upon the market and sold for just what it is. It is also established that the state may prevent the sale of oleomargarine as butter, and may regulate its sale in such manner as will prevent deception in its use. It is unfair trade to sell oleomargarine to those who want butter, and thus cheat them in the product furnished. While the manufacturer of oleomargarine has the right to make and sell it as such, the person who desires butter upon his table three times a day has the legal right to know that he is purchasing butter in fact, and not some substitute. The farmer who manufactures dairy butter must submit to an honest competition with oleomargarine, as oleomargarine, so that those who prefer it to butter, may be supplied. But he has the legal right to insist that oleomargarine shall not be sold as butter, and that those who desire his product shall not be furnished with oleomargarine by being induced to believe that it is butter.

The state is formed for the benefit of its people, so that its laws may protect the person, property, and personal rights of the citizens, and, to protect the right of all, it is necessary that some infringement be made upon the natural rights of the few. Protection to the public necessarily means restraint upon some. The real function of government is the protection of its citizens, and the promotion of the public health, safety, welfare, and convenience, and that function is called the "police power." It is said the police power of the state cannot well be defined, and that it is not safe to attempt abstractly to place a limit upon it. Changed circumstances and conditions from time to time make necessary and proper its exercise, and it may properly result that the property and the personal rights of individuals are interfered with, circumscribed, and limited. The welfare of the many in a proper case may bring about an injury to the few.

Laws have been passed which, if observed, prevent in large measure the sale of oleomargarine to persons desiring butter, and the manufacturer of oleomargarine is concededly hampered by the requirements as to the manner of its packing, the way in which it shall be stamped, the notice at the public table and at the grocery store that oleomargarine is in fact furnished. These provisions, perhaps, make it expensive and inconvenient for the manufacturer and necessarily interfere with the sale of his product; but the in-

terference results from the necessity of preventing the dealer and the ultimate consumer of butter from being deceived in accepting an imitation. Laws prohibiting the sale of certain articles, except in a certain manner, are not self-executing. A desire for unreasonable gain leads evilly disposed people to transgress the law. Many times it is not enough for the Legislature to prohibit acts; but it becomes necessary to pass laws which render it difficult, if not impossible, to commit crime.

People v. Bootman, 180 N. Y. 1, 72 N. E. 505, 2 Ann. Cas. 226, is a clear illustration on this point, and is significant in interpreting the statute in question. In that case during the closed season it was illegal to have in possession certain game birds. It was contended that the game laws of the state could have no extraterritorial effect, but that the act, properly construed, prohibited the possession of the birds no matter where killed; that if the birds were killed in another state, where the killing was legal, they were private property, and the owner had the legal right to bring them into this state at any time in the same manner as he would bring other property, not inherently dangerous or detrimental to the public health or safety; and that the statute was therefore unconstitutional. The Court of Appeals, however, held that it was within the police power to protect the game birds of the state; that as it might be difficult in a given case to prove that the bird, possessed out of season, was captured in the state, and as the accused might wrongfully claim that a bird captured in the state was captured elsewhere, it was a proper exercise of the police power, in order to enforce the statute for the protection of domestic birds, to prevent the possession in the state of birds killed elsewhere. For fear that the game law would not be observed as to domestic birds, the property rights of the owner of birds killed outside of the state were practically destroyed, so far as use within the state is concerned.

In this case, while perhaps the statutes are ample for the protection of those who desire to purchase natural butter and for those who manufacture it, if all were willing to observe them, nevertheless in order that all must observe the law, the Legislature may well determine that other restraint must be put upon the manufacturer and vendor of oleomargarine. If there is an exigency which, in the judgment of the Legislature, calls for a further exercise of the police power with reference to oleomargarine, and the law in question has a reasonable tendency to bring about the desired effect, its validity must be recognized, although it puts an additional burden upon the manufacturer.

The basic ingredients of oleomargarine are the beef fat and the hog fat, but the product from a mixture of such quantities of those facts would not be such that it could be sold as a substitute for butter. The texture of oleo oil is granular. It has a mottled appearance, and is not "smooth" to the taste. Cotton seed oil and butter, churned into it, smooth out the texture, give it a finish, and take out the grain. The record indicates that cotton seed oil or other vegetable

oil alone would well do this; but the compound would not have an agreeable taste, and would not be capable of being a substitute for butter. The product is therefore churned in butter or cream to give it the butter flavor, and, as the defendants' expert says, "to give it the general agreeable taste." It might be given an agreeable taste, if supplied with some other flavor than that of butter. It is evident the butter flavor is deemed important.

Prior to 1902, oleomargarine was colored with the ordinary butter colors, so that by the use of butter in its makeup it was given the flavor of butter, and by use of the coloring matter it was given the same appearance. We had, then, a product chemically the same with butter in substance, color, and looks. The people, however, have a natural prejudice for genuine butter, and have the right to exercise that prejudice, and not be cheated out of it. Apparently some legislation was necessary to prevent the cheaper compound from being imposed upon the public without its knowledge. The United States internal revenue law (Act May 9, 1902, c. 784, § 8, 32 Stat. 193 [U. S. Comp. St. 1911, p. 969]) in that year, by imposing a tax of 10 cents a pound upon artificially colored oleomargarine, eliminated to a certain extent the chance of deception as to color. In the public mind, pure butter carries with it the idea of a yellow color. The tint varies, and depends upon whether the cow is stall-fed or grass-fed, the age of the cow, the season of the year, the breed of the cow, its general condition, and other circumstances. One witness swears, and the evidence is not contradicted, that 90 per cent. of the butter offered for sale has some coloring matter in it. Section 30 of the Agricultural Law (chapter 9, Laws 1909 [Consol. Laws 1909, c. 1]), in defining butter, permits coloring matter and salt to be added to the product of the milk or cream.

Two samples of oleomargarine were before the trial court. The John F. Jelke Company, who are the largest manufacturers in the country, produce what is called a cream white product. It is substantially white, but there is some tint of yellow in it. It appears without contradiction that neutral oil is of very light color, without any tint; that oleo oil and cotton seed oil have a yellowish tint, and that the particular tint of oleo oil depends upon the breed of the animal from which it was taken, whether stall-fed or grass-fed, poor or lean, the age of the animal, and the time of year of production. The cotton seed oil is chemically purified. The cotton seed oil and the oleo oil may be bleached to practically a water white. The yellowness or tint of yellow which the product shall bear depends entirely upon the color of the constituent parts. The Jelke Company purchases the constituent parts in the open market, and any manufacturer can purchase cream white constituents or yellower constituents. It does not appear that it is more difficult to obtain one than the other, or that there is any substantial difference in the price. This is indicated by the fact that the Jelke Company uses entirely the whiter constituents, even though it artificially colors its product for sale in localities where coloring is permissible. Its product is of a uniform tint or color, and it competes in the market with the Ar-

mour product. The Armour Company product, the other sample before the court, is of a uniform color, and has been upon the market since 1902, but is of a much yellower tint than the Jelke product; the Armour product being characterized by one of the witnesses as a "lemon yellow," and by defendants' chemist as a "straw color."

This case differs materially from the other oleomargarine cases in the fact that it appears that there are now upon the market constituents from which the oleomargarine is made where the purchaser may select whether he will have a cream white product or the so-called selects the whiter constituents, it naturally follows that the Armour lemon-colored product. While the Jelke Company concedes that it Company, in putting out its product in uniform color since 1902, selects the yellower constituents. Undoubtedly, the extra yellow tint to the Armour product, the one in question, more closely resembles natural butter, as it is known to the trade and the ultimate consumer, than the Jelke product.

A manufacturer of a brand of oleomargarine cannot purchase the constituents promiscuously. It must buy constituents of a uniform color, or the color of its product will vary. The evidence, therefore, fairly indicates that the product in question was made by a selection of the yellow-colored ingredients. The use of a very yellow butter would tend to make the manufactured compound yellower than if a very light-colored butter were used. The same is true of the cotton seed oil and the oleo oil.

[2] The statute in question, section 38 of the Agricultural Law, so far as we are concerned with it, prohibits the manufacture of oleomargarine in imitation or semblance of natural butter produced from pure, unadulterated milk or cream. So far as protecting the public from deception is concerned, it is immaterial whether some coloring matter is inserted in the oleomargarine to make it a closer imitation of butter, or whether the constituents from which it is made are selected so that the product itself shall resemble butter.

I think the statute is a proper police regulation, and prohibits a manufacturer from a selection of ingredients in such a manner as designedly makes his product a closer imitation of natural butter. Having appropriated its flavor from natural butter, it is not an unreasonable burden upon the manufacturer to require him to select such light-colored constituents as will result in a product that shall not defraud the ultimate consumer and the farmer. The Jelke sample shows that, without detriment and without substantial burden upon the manufacturer, the cream white article can be produced as satisfactorily, if not more so, than the so-called lemon yellow one. There is no legitimate reason or excuse for the production of the yellower article, except a desire to make it resemble and imitate butter in appearance, thus breaking down the only remaining test left to the nonexpert.

It is not claimed that there was deception in the sale of the samples which were bought of the defendants by the state's representatives. It was bought as oleomargarine, and the defendants had complied with the revenue laws, so that the immediate purchaser would know

what he was buying. But the object of this police law is to make it impracticable to commit the fraud of selling oleomargarine as butter. This action is aimed at the product rather than at the seller.

No good reason is suggested why the manufacturer should select yellow ingredients, if it is not done for the purpose of making the product more closely resemble butter. I think it is a fair inference from all the evidence that the yellower ingredients were used for the purpose of making the product resemble natural butter, and so closely to imitate the appearance of butter that it would be easier to deceive the public in its sale. I favor a reversal of the judgment upon the law and the facts.

Judgment reversed upon the law and facts, and new trial granted, with costs to appellant to abide event. The following findings of fact are reversed, as contrary to the evidence: The fourth, the eighth, and that part of the seventh, which finds "the said color was derived solely from the natural and usual ingredients composing said substance." All concur, except SMITH, P. J., and HOUGHTON, J., dissenting, on the opinion of Cochrane, J., at Trial Term.

